Application of Lieutenant Francis Theodore REITEMEYER

v.

Lieutenant Colonel Hector McCREA, Commanding Officer, Troop Command, Fort Holabird, Maryland
and
United States Army.

Application of Lieutenant Michael J. COHN

v.

Lieutenant Colonel Hector McCREA, Commanding Officer, Troop Command, Fort Holabird, Maryland
and
United States Army.

P.F.C. Richard Garison ELLIOTT

v.

Colonel Charles B. BOSWELL.

P.F.C. David Phillip QUAGLIA

v.

Colonel Charles S. BOSWELL, Commandant.

Civ. Nos. 20406, 20407, 20426, 20460.

United States District Court
D. Maryland.
July 14, 1969.

William H. Zinman, Baltimore, Md., for petitioners Reitemeyer and Cohn.

Elsbeth Levy Bothe, Baltimore, Md., for petitioner Elliott.

Harold Buchman, Baltimore, Md., for petitioner Quaglia.

Stephen H. Sachs, U. S. Atty., and Alan I. Baron, Asst. U. S. Atty., for defendants McCrea and Boswell.

Stephen H. Sachs, U. S. Atty., and Clarence E. Goetz, Asst. U. S. Atty., for defendant Boswell.

FRANK A. KAUFMAN, District Judge.

In these four cases, the petitioners, all members of the United States Army, respectively seek writs of habeas corpus to require their discharge from the Army. Each of the petitioners alleges that he has a conscientious objection to military service and is therefore entitled to be released under the provisions of Department of Defense Directive No. 1300.6 (D.O.D.), dated May 10, 1968 as amended by Change 1, dated December 20, 1968, and Army Regulation 635–20 dated December 3, 1968 (A.R.).[1] Those

---

1. On May 10, 1968, pursuant to the general power of the Secretary of Defense as the chief executive officer of the Department of Defense under 10 U.S.C. § 133, that Department promulgated D.O.D. Directive 1300.6 "Conscientious Objectors." The Directive was amended on December 20, 1968.

In that Directive, it is stated: "The fact of conscientious objection does not exempt men from the draft," but Congress has "deemed it more essential to respect a man's religious beliefs than to force him to serve in the Armed Forces and accordingly has provided that a person having bona fide religious objection to participation in war in any form * * * shall not be inducted into the Armed Forces but will be required to serve his country for the same period of time in civilian work contributing to the maintenance of national health, safety, or interest under a civilian work program administered by Selective Service." Further, the Directive states that "Consistent with this national policy, bona fide conscientious objection [as set forth in the Directive] by persons who are members of the Armed Forces will be recognized to the extent practicable and equitable. Objection to a particular war will not be recognized."

A.R. 635–20, entitled "Personnel Separations—Conscientious Objection," sets forth policy and procedure to be followed. Paragraph 3, headed "Policy" provides as follows:

a. Consideration will be given to requests for separation based on bona fide conscientious objection to participation in war, in any form, when such objection develops subsequent to entry into the active military service.

b. Federal courts have held that a claim to exemption from military service under Selective Service laws must be interposed prior to notice of induction, and failure to make timely claim for exemption constitutes waiver of the right to claim. However, claims based on conscientious objection growing out of experiences prior to entering military service, but which did not become fixed until entry into the service, will be considered. Requests for discharge after entering military service will not be accepted when—

regulations set forth standards and procedures pursuant to which a member of the Army (in the case of D.O.D., a member of the Armed Forces) who claims conscientious objection to participation in war in any form, may apply for and be entitled to his release as a conscientious objector. An applicant so requesting his discharge must be given a counselling interview by a chaplain, a psychiatric interview by a psychiatrist, and the opportunity to appear, with his own privately retained counsel if he desires, before an officer in the grade of O–3, i. e., Captain, or higher, "who is knowledgeable in policies and procedures relating to conscientious objection matters." A.R. 635–20.4(d). The latter officer is required to make a recommendation, and to set forth the reasons therefor, concerning the application for discharge. If an applicant has served less than 180 days, he is subject to further order by his local Selective Service board to perform civilian work in accordance with the standards set forth in 50 U.S.C.A. App. § 456(j).[2] In the cases considered herein, all of the petitioners have served more than 180 days in the Army. Therefore, if their contentions in these cases are meritorious, they are entitled under the regulations to be discharged.

The Government has not questioned the jurisdiction of this Court to entertain the petitions and to reach the merits of the applications for habeas relief. This Court's jurisdiction in this respect has, in any event, recently been settled, absent a contrary holding by the Supreme Court of the United States, by the Fourth Circuit in United States ex rel. Peter S. Brooks v. Clifford, et al., 409 F.2d 700 (4th Cir. March 20, 1969), rehearing denied, 409 F.2d 700 (4th Cir. June 25, 1969). The March 20, 1969 opinion in *Brooks* was filed after the initial hearings in these cases but prior to completion thereof. As in *Brooks,* all of the parties in these four cases agree that the scope of judicial review is "the sharply limited one of determining whether there was a basis in fact for the finding [by the Army in these cases] that petitioner was not a conscientious objector." *Brooks, supra* at 705.

This Court, following *Brooks* (at 706), does not consider whether the Defense Department and/or the Army are required by the Constitution or by any act of Congress to provide for discharge of a member of the Armed Forces who is conscientiously opposed to his own participation in war in any form. But once regulations are in fact promulgated, they must be followed "scrupulously" (Brooks, supra at 706). While certain sections of the aforementioned Directive and Regulation indicate retention by the Army of final discretionary authority under the facts and circumstances in each case, in all four of these cases the only questions raised are whether or not (a) the conscientious objection is based on religious belief which crystallized after the petitioner became a member of the Armed Forces, and (b) the claim of conscientious objection is sincere. Thus,

(1) Based solely on conscientious objection which existed, but which was not claimed prior to induction, enlistment, or entry on active duty or active duty for training.

(2) Based solely on conscientious objection claimed and denied by the Selective Service System prior to induction.

(3) Based on essentially political, sociological, or philosophical views, or on a merely personal moral code.

(4) Based on objection to a particular war.

c. All requests for discharge based on conscientious objections will be considered on an individual basis in accordance with the facts and special circumstances in a particular case.

d. Final determination on all requests for discharge based on conscientious objection (to include those listed in b above) will be made at Headquarters, Department of the Army.

2. If an applicant has more than 180 days military service, he is asked to state in his application for discharge whether he is willing to engage voluntarily in work of such civilian nature, after his military discharge.

in these cases, this Court is required, against the background of the meaning of the word "religious," to determine whether there is any basis in fact, in each of the four cases, for the Army to deny the sought-after discharge on the grounds that the views held by the applicant are either nonreligious or lacking in sincerity.

The applicable regulations, following the pattern set by the Congress in 50 U.S.C.A. App. § 456(j), provide that views which are essentially political, sociological or philosophical, or based on a merely personal code (*see*, e. g., A.R. 635–20.3b(3)) are not religious views. However, it is clear that even if an applicant's views are grounded in or constitute, in part, political, sociological or philosophical views or a personal moral code, nevertheless they are "religious" within the meaning of the applicable regulations if the applicant is, as Judge Winter has written in *Brooks*, "substantially motivated by views derived from religious training and belief." *Brooks*, *supra* at 708 and ff., discussing and relying upon United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), and Fleming v. United States, 344 F.2d 912, 916 (10th Cir. 1965). Nor must the religious views be grounded upon the teachings of a formal religion if they are "sincere and meaningful * * * [and occupy] in the life of its possessor a place parallel to that filled by the God of those admittedly qualif[ied]" to be classified as conscientious objectors. *Seeger*, 380 U.S. at 176, 85 S.Ct. at 859. Belief in a traditional God is not necessary. The registrant, Seeger, who did not believe in God at all, was held entitled to exemption as a conscientious objector. Nor is it necessary to have a belief in a so-called Supreme Being. Congress, in the 1967 amendment to section 456(j), removed all references in the statute to belief in a Supreme Being. What is necessary is that "the belief be based on faith and that it occupy a similar place as do orthodox religious views." United States v. Shacter, 293 F.Supp. 1057,

1060 (D.Md., Harvey, J., December 12, 1968). And in *Brooks*, Judge Winter noted that *Seeger* was written "at a time when § 6(j) required that the qualifying religious training and belief stem from the individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relationship" and that in 1967, Congress "eliminated this restrictive language." (*Brooks*, *supra* at 707 n. 5)

Chief Judge Wyzanski in United States v. Sisson, 297 F.Supp. 902 at 911 (D.Mass. April 1, 1969) (appeal noted by the Government to the Supreme Court, 395 U.S. ——, 90 S.Ct. 92, 23 L. Ed.2d —— (1969), has written that those who administer the Selective Service Act "and this court both agree that Congress has not provided a conscientious objector status for a person whose claim is admittedly not formally religious." A reading of *Sisson* indicates that Judge Wyzanski has interpreted the 1967 amendment to section 6(j) as a congressional narrowing of the definition of the word "religious" when compared with the Supreme Court's reading of that word as revealed in *Seeger*. *Sisson* involved a man who was denied conscientious objector status by Selective Service and who, after his conviction for violation of the Selective Service Act, successfully applied for a motion in arrest of judgment. In *Sisson*, Judge Wyzanski held that under the facts of that case "the free exercise of religion clause in the First Amendment and the due process clause of the Fifth Amendment prohibit the application of the 1967 draft act to Sisson to require him to render combat service in Vietnam" (at 910) and wrote that in that act "Congress unconstitutionally discriminated against atheists, agnostics, and men, like Sisson, who, whether they be religious or not, are motivated in their objection to the draft by profound moral beliefs which constitute the central conviction of their beings" (at 911); and that "in granting to the religious conscientious objector but not to Sisson a special conscientious objector status, the

Act, as applied to Sisson, violates the provision of the First Amendment that 'Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof.' " (at 911). In *Shacter* (at 1060), Judge Harvey noted: "If the words 'religious training and belief' were to be given a narrow construction, serious constitutional questions would have been presented, for then it could forcefully be argued that through this enactment Congress was in effect preferring some religions over others in violation of the First Amendment and the due process clause of the Fifth Amendment."

Shacter, like Sisson, was charged with failure to obey a draft board order to report for and submit to induction into the Armed Forces of the United States. In these four cases, each of the petitioners is in the Army, and seeking discharge from it. The record in several of the within cases, particularly in Quaglia, indicates strongly that the Army itself, in passing upon applications for discharge, has adopted the broader definition of religion set forth in *Seeger* and has provided conscientious objector status for a member of the Army whose claim of conscientious objection is not formally religious. In any event, *Brooks*, dealing also with a member of the Army seeking discharge as a conscientious objector, has settled the matter in this Court until and unless the Supreme Court speaks to the contrary.

The record in each of these cases includes the application for discharge as a conscientious objector of the petitioner and the communications and written actions of the Army thereafter in connection with the application. The Army files, as originally made available in three of these cases, were not complete. It was therefore necessary to suspend the hearings in these cases and to withhold final action in them until the complete Army files were at hand.[3]

### Reitemeyer

Reitemeyer, stationed at Fort Holabird, Maryland, applied on November 9, 1968 for separation from the Army under A.R. 635–20 as a conscientious objector. That request was denied on January 17, 1969.

Reitemeyer, born in New Jersey, attended Catholic parochial schools, and the Divinity School at Seton Hall, a Catholic university. After two years at

3. In addition, further delay occurred in the completion and filing of this opinion after the Government sought and obtained a rehearing in *Brooks* upon the grounds that the petitioner had failed to exhaust his within-the-Service remedies since he had not applied for relief to the Army Board for Correction of Military Records. On June 25, 1969, the Fourth Circuit denied the rehearing and held that petitioner was not barred from relief on grounds of lack of exhaustion. Noting the contrary decision in Craycroft v. Ferrell, 408 F.2d 587 (9th Cir. 1969), and Judge Butzner's dissent to the June 25, 1969 *Brooks* decision, this Court is bound on that issue by Judge Winter's majority opinion in *Brooks* on that date. On that basis, this Court holds that, in these cases, all four petitioners have exhausted their in-Service remedies and that these cases are ripe for adjudication in this Court. Nor has the Government contended otherwise in these cases, though the decision in *Craycroft* and the Government's arguments in *Brooks*, if accepted by the Fourth Circuit, might well have required this Court not to reach the merits in these cases because of lack of exhaustion.

The Court is grateful to all counsel for stipulated agreements as to exactly what constitutes the records in these cases. In that connection, while it is clear that the Army should be free to develop its own procedures, and that the courts should not impose judicial procedural requirements upon it, nevertheless it must be noted that in these cases the records contain little explanation or statements of reason and few subsidiary findings of fact to support broad, conclusory factual remarks. The application by a reviewing court of the "no basis in fact" test would be made much simpler if basic, subsidiary facts and reasons were set forth in simple, lay language by the military officers involved. They of course should not be expected to write, think or act like lawyers but it would be helpful, for instance, if they did state clearly, in a few sentences, why they find a man's views sincere or lacking in sincerity.

Divinity School, he spent approximately two and one-half years at a Catholic seminary studying for the priesthood. He alleges in his request for discharge, that " * * * after two and a half years [at the Seminary] I realized I could better serve my God as a teacher than as a religious [sic] because I would be with people at their most educatable age, when their minds are quick to grasp at knowledge. And at a time when they are still young enough to think over these principles of love so as to implement them in their adult lives." He further alleges: "After leaving the Seminary I applied and was accepted into graduate school, there to obtain my master's degree in education. However, while waiting for school to start I was drafted [sic]. [apparently about to be drafted], and having grown in a society plagued by wars and their acts of violence, I didn't give it too much thought at that time. I was born in the atmosphere of World War II and grew during the Korean Conflict. So, still confused by the problems that exist in one leaving a seminary, I enlisted for Officer Candidate School with the intentions of doing the best possible job. However, the deeper I became involved the more I realized I could have no part in the military and what it allows in order to fulfill its 'mission.'" He further alleges: "Since I left the seminary my beliefs have become stronger through personal introspection and discussion with other individuals. * * * Until I received orders for this intelligence program and ultimate assignment in MACV my beliefs were not completely formed. The more deeply involved in this program I became the deeper was my thought. Finally, my beliefs were solidified and so now I present myself as I am a conscientious objector to war and violence of any kind."

Reitemeyer enlisted, completed basic training, applied for, attended, and was graduated from Officer Candidate School and was then assigned to Air Defense Artillery. In that assignment he became the "adjutant at Group." He states that this duty was "so removed from actual combat and so filled with administrative problems that unfortunately I let my thoughts wander onto other things rather than explicitly for bringing my thoughts to the conclusion which I have now come to." It was after he was assigned to duty in Vietnam that, he alleges, his "beliefs" crystallized. However, he writes: "My present assignment was actually nothing more than a catalyst.[3a] It once again brought things to the forefront of my mind; it brought my beliefs back into perspective and made me solidify them. Thusly, I cannot have anything to do with the military because of its adherence to the use of violence and murder. I must remove myself as far as possible from this and any organization that organizes itself for the purpose of violence and killing."

Additionally, Reitemeyer, in his application for discharge as a conscientious objector, filed in accordance with Army regulations, alleges that his "belief which I now claim has been building within me from my birth. My mother and father, both of whom are very strong in their Catholic upbringing, instilled in me a stron[g] faith in God and Jesus Christ. So strong were my religious tendencies that upon completion of Catholic elementary and high school I went and joined the Divinity School at Seton Hall University. After two years here, I went on to the major seminary, Immaculate Conception Seminary, at

---

**3a.** It is not clear whether Reitemeyer is referring to his present assignment to the Intelligence School or his assignment to Vietnam.

Reitemeyer's application sets forth that he left the Seminary in October, 1966, entered the Army in January, 1967, completed basic training in March, 1967, attended Artillery Officers Candidate School July–December, 1967, spent approximately nine months in an Air Defense assignment in Ohio, and was sent to Intelligence School at Fort Holabird in October, 1968 in preparation for ultimate assignment to Vietnam.

Darlington, New Jersey to study for the priesthood. There I learned a great deal about myself and my relationship with Jesus Christ. I learned of his life and the way he lived. I learned to incorporate this into my own life, so much so that it made daily living and communicating most enjoyable."

Reitemeyer, in his request for separation from the Army because of conscientious objection, has set forth background facts, a statement and presentation of his religious beliefs and letters from certain persons who knew him, commenting with regard to his background and beliefs.

On December 4, 1968, Major Roger T. Dunn, a Catholic chaplain, reported by letter that in accordance with Regulation 635–20, he had counselled Reitemeyer and spoken with him for about an hour and that:

> as far as I know he is sincere in his claims as a conscientious objector. He says that the sources of his beliefs are a deeper understanding of the Christian message as it applies in our present world. My own views are so strong concerning these matters that I find it difficult to remain completely objective.

Under the applicable regulation the chaplain was required to submit a report of the interview including comments relative to the sincerity of Reitemeyer's belief and an opinion as to the source of such belief. On December 10, 1968, Lieutenant Reitemeyer filed a statement which reads in part as follows:

> In order to clarify the ambiguity of his [Major Dunn's] statement I wish to say that MAJ Dunn has served in Viet Nam twice and is a strong proponent of the war in Viet Nam.

On December 4, 1968, Reitemeyer was examined by an Army psychiatrist at Fort Holabird, Lieutenant Colonel Franklin Moten. Under A.R. 635–20, the psychiatrist is required to "submit a report of psychiatric evaluation indicating the presence or absence of any psychiatric disorder which would warrant treatment or disposition through medical channels." The Army psychiatrist found no psychotic disease and commented, in part, as follows with regard to Reitemeyer's pertinent history:

> This 24 year old 2Lt with 23 months active duty was seen in the Mental Hygiene Consultation Division after developing feelings of conscientious objection to activities which might be required of him in forthcoming assignment to Viet Nam. He comes from a strong religious background, having been raised predominantly in parochial schools and having attended 4½ years of studying for the priesthood in a catholic seminary. He got out of this feeling he could better serve his religious beliefs as a layman and was drafted in the military. He then applied for and was accepted and attended successfully OCS and was assigned in the Artillery Air Defense Command. He at that time feels that he had not an occasion to confront his feelings about violence in that his activities seemed impersonal, but upon receipt of orders for Viet Nam and an assignment to the Intelligence School he became aware of certain of the personal aspects of warfare which he felt he could not accommodate. He is single, not engaged and has not had a history in the past sought medical treatment for psychiatric problems of any type.

> Subject EM [*sic*] is oriented, rational and coherent and gives no evidence of abnormal thinking or behavior suggesting a serious mental illness.

> Subject Officer does not seem to be mentally ill and whatever his religious and political feelings are, they are not the result of an overt mental illness.

On December 9, 1968, Reitemeyer wrote to Colonel Moten stating that the latter had misinterpreted what Reitemeyer had said in that Colonel Moten had reported that Reitemeyer was seen "after developing feelings of conscientious objection to activities which might be required of him in forthcoming assignment to Viet Nam"; whereas, ac-

cording to Reitemeyer, his "assignment to Viet Nam was only one factor in the realization that I could not support any war or violent action. Your statement is in error and I would appreciate a correction to your report." The record discloses no further statement by Colonel Moten after Reitemeyer's letter to Colonel Moten dated December 9, 1968.[4]

Following Reitemeyer's application, he was afforded an opportunity to appear in person, with his privately retained counsel, before Captain Richard N. Wise. Captain Wise is in the Adjutant General's Corps and is stationed at Fort Holabird, Maryland. Prior thereto, he had been Chief, Separation and Transfer Section at Fort Eustis, Virginia for eighteen months and in the course of his responsibilities at Fort Eustis had some connection, though apparently largely administrative and ministerial, with the processing of ten to twenty applications for discharge on the grounds of conscientious objection. In addition, earlier in his Army career, Captain Wise attended a school conducted by the Adjutant General's Corps at Fort Benjamin Harrison. During this course of instruction, five weeks in length, consideration was giv-

en, at one or more times, to questions concerning conscientious objection.

Captain Wise's report notes that Reitemeyer "states that he is opposed to all wars and would not function as a noncombatant in military service" and contains the following under the heading, "Recommendation":

I recommend Disapproval of his request for discharge by reason of conscientious objection. I further recommend that the orders assigning 2LT Reitemeyer to RVN be rescinded and that he not be assigned to any hostile fire area.

These recommendations are prompted by my belief that 2LT Reitemeyer is sincere in his claim of conscientious objection. However the chronology and formulation of his convictions plus the fact that he sought and received counsel from an organization known as the Central Committee for Conscientious Objectors indicates his views to be essentially philosophical or based on personal morals.

Although I find his objections to participation in war sincere in every respect, I believe his rational[e] for this objection to be misguided.[5]

---

4. The contention is made that the Army psychiatrist, Colonel Moten, by submitting a report containing certain statements attributed to Reitemeyer and also to Cohn, violated the confidential relationship between doctor and patient. A.R. 635–20.4 (c) requires the psychiatrist to submit a report. There is no merit in this contention.

5. Reitemeyer and Cohn are represented by the same counsel in this Court. They were each accompanied by him when they individually appeared before the same Army captain, Captain Wise, for their interviews by an officer in the grade of O–3, knowledgeable in conscientious objector matters. Counsel for Reitemeyer and Cohn takes the position that the procedures followed by Captain Wise violated the Army's own regulations, and that, further, even if they were not so violative, they were unconstitutional and thus invalid. It is conceded by respondents that Captain Wise held what might be more aptly described as an interview rather

than a hearing. It is conceded by Reitemeyer and Cohn that their counsel was present during the proceedings respectively involving each of them. An enlisted man, assigned to the staff of Captain Wise, was present to take notes, but no transcript was made, and the notes made by the enlisted man, for the benefit of Captain Wise, were not retained, and were in fact destroyed, after Captain Wise wrote his report. Reitemeyer and Cohn contend that each of them was entitled to a hearing, and that it was necessary that a verbatim transcript be recorded and be made available in connection with such a hearing. It is clear that the Army regulations do not so require. Nor is there any constitutional requirement that the Army conduct its proceedings in connection with its conscientious objection regulations in a semi-judicial or administrative type of hearing, rather than an executive type of interview.

Reitemeyer and Cohn also attack the qualifications of Captain Wise. The Army regulations require that the appear-

On December 11, 1968, Reitemeyer's Commanding Officer at Fort Holabird wrote to the Adjutant General in Washington, D. C., through channels, recommending disapproval of the request for discharge for reason of conscientious objection by Lieutenant Reitemeyer, and stated, in part, as follows:

* * * Although sincere in his moral belief and objection to any type of violence, there is some doubt as to the validity of conscientious objection. It would indicate naivete after spending 23 months in the service, completing basic training, attending OCS, and subsequent assignment to an air defense artillery unit, that the basic purpose and mission of the US Army be unknown to him. 1LT Reitemeyer was recently promoted to his present grade. He took the oath of office as an officer in the US Army and has reaped benefits of that status and should be required to complete his obligation of active duty.

The Commandant of the Military Intelligence School at Fort Holabird also recommended disapproval, on December 11, 1968, as follows:

1LT Reitemeyer voluntarily left the Seminary in 1966. He enlisted in the US Army and volunteered for Officers Candidate School, receiving extensive training in military arts and sciences without apparent objection on his part. His assignment in Air Defense Artillery and training in this specialization of the art of warfare met with no evidenced objection. The basic mission of the US Army must have

been clear to him. The validity of his conscientious objection is, at best, doubtful.

In accordance with the provision of A.R. 635–20, providing for coordination between the Army and the Selective Service System, the Adjutant General on December 17, 1968 wrote to the Director of Selective Service requesting an advisory opinion. He received a response dated January 9, 1969 from General Hershey, the Director of the Selective Service System, stating:

Based on the information in this file, it is my opinion that Second Lieutenant Francis Reitemeyer would not be classified as a conscientious objector if he were being considered for induction at this time.

No further reason or elaboration was set forth in General Hershey's letter.

The final decision on applications such as Reitemeyer's is made by the "Class 1–O Conscientious Objector Review Board." On January 15, 1969, one of the members of the Review Board wrote:

Religious sincerity in doubt. I feel this is more so a personal moral code.

A second member of the Board wrote on January 15, 1969:

Recommend disapproval—individual voluntarily left Seminary, voluntarily entered Army, attended Army OCS and served 23 months in ADA assignments before his beliefs "crystallized" after receipt of Vn orders. Based on personal beliefs and interpretation of religious creed.

---

ance be before "an officer in the grade O-3, or higher, who is knowledgeable in policies and procedures relating to conscientious objector matters." Captain Wise, being O-3 (Captain), was of the required grade. He has some training in policies and procedures relating to conscientious objector matters. He was a member of the Adjutant General's Corps. It seems clear that no court should review the qualifications of an Army officer for a particular assignment

except in the most unusual circumstances. In this case, Captain Wise possessed, at the very least, the minimum qualifications required under the Army regulations. Captain Wise testified that members of the Adjutant General's Corps are customarily assigned to conduct interviews under A.R. 635-20 and that he was so assigned because he was a member of that corps. No contrary testimony appears in the records.

The third member of the Board wrote on January 16, 1969:

> Disapproved. Sincerity is questionable in view of extensive training during which an objection might well have arisen. Apparently he has received orders for RVN.

The *Reviewing Officer,* an administrator who is neither a member of the Board nor a participant in its deliberations, noted:

> Disapproved. Evidence does not support the sincerity of the applicant's claim to objection to service because of religious beliefs.

On January 17, 1969, the Adjutant General wrote to Reitemeyer as follows:

> Your request for separation based on conscientious objection has been disapproved. Evidence presented does not support the sincerity of your claim to objection to service because of religious beliefs. In reaching this decision, consideration was given to an advisory opinion furnished by the Director of Selective Service. You will be retained in the military service, subject to normal duty assignments.

 Captain Wise refers to the fact that Reitemeyer sought and received counsel from an organization known as the Central Committee for Conscientious Objectors. Captain Wise reached the conclusion that Reitemeyer's views were essentially philosophical or based on personal morals. The record does not disclose what the Central Committee for Conscientious Objectors is, or in what way Reitemeyer sought and received counsel from that organization. One member of the Board of Review reached the conclusion that Reitemeyer's objections were "based on personal beliefs and interpretation of religious creed," and a second member of the Board of Review stated that it was his feeling that Reitemeyer's objection is "more so a personal moral code." A review of Reitemeyer's application, and of the entire record presented by the Army to the Court in this case, contains no factual basis for the conclusion that Reitemeyer's objections were not "substantially motivated by views derived from religious training and belief." *Brooks, supra,* 409 F.2d at 708.[6]

6. The question has been raised as to whether the petitioners are entitled in this Court to a hearing *de novo,* or at the very least, a partial *de novo* hearing to supplement the merits of petitioner's claims for discharge as a conscientious objector. This Court believes that it is for the Army, and for the Army alone, to conduct inquiries into, and to receive and to determine the facts with regard to, the merits of Reitemeyer's request for discharge as a conscientious objector. The role of this Court is simply to determine whether the Army's conclusions on those merits are substantiated by any basis in fact. That, and that alone, is the limited function of this Court.

After these cases were filed in this Court, Reitemeyer and Cohn submitted affidavits, upon advice of counsel, alleging that each of them, prior to his application for discharge as a conscientious objector, was subjected to specialized training covering projected assignments in Vietnam as members of the Phoenix Project which cystalized and fixed their respective beliefs against their participation in war in any form. In Cohn's affidavit, it is stated:

> Nondisclosure of this detailed statement, within the record, was actuated, at least in part, by your Petitioner's fear that disclosure of the same might constitute a violation of military regulation, and for that reason alluded to the subject matter generally. Disclosure is now made with advice of counsel, on the ground that it is legally relevant to your Petitioner's status.

A similar statement appears in Reitemeyer's affidavit. As stated above, this Court believes that it should not act *de novo,* even in part, in these cases. However, this Court nevertheless notes that the assignments Reitemeyer (and Cohn) believed they were headed for when they filed their requests for discharge might raise the inference that they object to the performance of specific war duties and not to war in general. But, in Reitemeyer's case, Major Dunn and Captain Wise

In *Brooks* (409 F.2d 708), Judge Winter wrote:

> \* \* \* even if petitioner was motivated in part by a personal moral code, he is still entitled to the exemption because of the unquestioned finding that he was also substantially motivated by views derived from religious training and belief.

Obviously, in order for a man's views to qualify as bona fide conscientious objections, they must be sincere. As Mr. Justice Clark wrote in United States v. Seeger, 380 U.S. 163, 184–185, 85 S. Ct. 850, 863, 13 L.Ed.2d 733 (1965):

> The validity of what he [a person alleging a religious belief against war] believes cannot be questioned. \* \* \*
>
> \* \* \* . \* \* \*
>
> [W]e hasten to emphasize that while the "truth" of a belief is not open to question, there remains the significant question whether it is "truly held." This is the threshold question of sincerity which must be resolved in every case. It is, of course, a question of fact—a prime consideration to the validity of every claim for exemption as a conscientious objector.

This Court also notes the following statements in Witmer v. United States, 348 U.S. 375, 381–382, 75 S.Ct. 392, 396, 99 L.Ed. 428 (1955), which are quoted in United States v. James, (4th Cir. June 26, 1969) (at 10–11 of the slip opinion):

> [In conscientious objector cases] the registrant cannot make out a prima facie case from objective facts alone, because *the ultimate question in conscientious objector cases is the sincerity of the registrant in objecting, on religious grounds, to participation in war in any form.* In these cases, objective facts are relevant only insofar as they help in determining the sincerity of the registrant in his claimed belief, purely a subjective question. In conscientious objector cases, therefore, any fact which casts doubt on the veracity of the registrant is relevant. It is "affirmative evidence \* \* \* that a registrant has *not painted a complete or accurate picture* \* \* \*" Dickinson v. United States, supra (346 U.S. 389, p. 396 (74 S.Ct. 152, at p. 157, 98 L.Ed. 132). In short, the nature of a registrant's prima facie case determines the type of evidence needed to rebut his claim. \* \* \* *If, as here, the issue is the registrant's sincerity and good faith belief, then there must be some inference of insincerity or bad faith.*
>
> *Since Witmer stated his beliefs with apparent sincerity, and since we find no indication anywhere in the record that his demeanor appeared shifty or evasive or that his appearance was one of unreliability,* we must examine the objective facts before the Appeal Board to see whether they cast doubt on the sincerity of his claim. [Emphasis added by Judge Winter in *James.*]

In the case at bar, Captain Wise, who personally talked with Lieutenant Reitemeyer, concluded that he "is sincere in his claim of conscientious objection." Major Dunn, who also talked with Reitemeyer, stated that "as far as I know he is sincere in his claims as a conscientious objector." Colonel Moten did not directly comment upon Reitemeyer's sincerity.

Reitemeyer's Commanding Officer also reached the conclusion that Reitemeyer was "sincere in his moral belief and objection to any type of violence" but went on to question the validity of the conscientious objection developing after twenty-three months in the Service.

One of the three members of the Review Board simply stated that religious sincerity was in doubt, a second did not attack sincerity, and the third said that sincerity was questionable in view of extensive training. The Reviewing Offi-

made no such distinction and accepted the sincerity of his statement of opposition to war in any form. Nor did Captain Dresin,

the chaplain who interviewed Cohn, or Captain Wise, make any such distinction in Cohn's case.

cer simply noted that the evidence did not support the applicant's claim based on religious beliefs.

The fact that Reitemeyer left the Seminary, determined to follow a lay mode of life, enlisted in the Service because he did not want to be drafted, went through the type of training which has been described, and received orders assigning him to duty in Vietnam, could well permit the factual inference to be drawn that Reitemeyer's views either became fixed before his entry into the Service, or that he was not sincere in his claim that they did not become fixed before entry into the Service. However, if Reitemeyer's beliefs were sincerely held, and if he was also being honest, candid and sincere in his statements that his beliefs did not become fixed until not only after his entry into the Service, but until after he was faced with the necessity of going into a threatre of war and becoming involved in acts of violence, then, assuming such sincerity, no such factual inference can be permitted. And in this case, two of the three persons who interviewed Reitemeyer, namely, Major Dunn and Captain Wise, found him to be sincere. The third interviewer, the psychiatrist, made no finding of sincerity or lack of sincerity.

In *Reitemeyer*, there is neither evidence, nor any plausible inference from the evidence, to support a holding that his beliefs are not sincerely held and are not, at least in part, based upon religious convictions. *See* Fleming v. United States, 344 F.2d 912, 916 (10th Cir. 1965) (cited with approval and relied upon by Judge Winter in *Brooks*). Thus, this is not a case in which conflicting inferences can be drawn from the same evidence. *Cf.* United States v. Pritchard, 413 F.2d 663 (4th Cir. 1969) (decided June 23, 1969). There is simply no rational basis for inferring that Reitemeyer's views, at least in part, are not based on religious training and belief.

In *Brooks* (409 F.2d at 707), Judge Winter wrote:

Neither the Army, in concluding that petitioner had not established that he was a conscientious objector entitled to discharge, nor the district court, in affirming the correctness of the Army's conclusion, advanced any reason which we deem legally sufficient to support that result. The fact that petitioner delayed the assertion of his claim until after his views had been formulated and that that did not occur until after his military service had begun and he had completed basic training and advanced or special weapon training is no ground to deny him discharge either under the Act, or the established administrative procedures, if in reality his views are sincerely held and are the result of religious training and belief. Indeed, the administrative procedures were devised for the very purpose of permitting the assertion of a claim of conscientious objection and proof of it, entitling the claimant to be discharged, when the objection was not formulated until after military service had begun. As far as the conclusory assertion that the evidence is insufficient to support petitioner's contention that he is a conscientious objector is concerned, we conclude, to the contrary, that *all* of the evidence points unmistakably to the conclusion that petitioner is in fact a conscientious objector within the guidelines established by the Supreme Court. [Emphasis in original.]

For the reasons stated, Reitemeyer is entitled to the relief he seeks.

### Cohn

Cohn, like Reitemeyer, was stationed at Fort Holabird and applied for discharge as a conscientious objector, on December 9, 1968. As in Reitemeyer's case, that request was denied on January 17, 1969. Cohn's application discloses that he received and participated in religious training as a Jew during his early life, that he attended services and took part in Jewish ceremonial observances during his middle teens, but then "drifted away" to more personalized religious philosophy. In college, he attended ROTC for 1½ years, but did not complete the course. He began law

school, but left disillusioned with what he describes as "a certain amount of hypocrisy which corresponded with that which I found offensive in organized religion." Upon receiving a notice from his draft board to appear for a physical examination and "believing that enlisting would effect a career more harmonious with my attitudes than would result if I had allowed myself to be drafted," Cohn enlisted on February 8, 1967. After basic training, Cohn attended Officer Candidate School, Defense Information School, and Intelligence School.

In his application for discharge, Cohn writes:

Although there were certain episodes during my basic training period which I found repugnant because of their involvement with slaughter and destruction, I considered the source, which was instructors who, whether with sincerity or not, had established a facade of brutality, and therefore, I viewed the possibilities of these situations actually occurring as somewhat less than real. Officers' Candidate School concentrated more on the absorption of academics and principles of leadership than it did on the disciplines of war. The thought that I would ever have to be a perpetrator was not an impending one at the time. Being assigned as an information officer at an Air Defense installation after commissioning, and concerning myself with news releases on chapel dedications and softball games, any notion of my participating in war became even more obscure.

This past September 1 received orders for Vietnam. Two weeks after the receipt of these orders was Yom Kippur. I was unable to take solace in the Day of Atonement. Six months earlier I had witnessed my father's struggle for life when he was stricken with a severe heart attack. I prayed to God that he not be allowed to die. The thought of his staying alive was the only concern that occupied my mind for weeks. Three months later my grandfather suffered a stroke. I had lived in the same house with my grandfather since I was an infant and I loved him dearly. I rushed to the hospital only to watch him die. The next day my uncle died. At their funeral, as I watched both coffins being lowered into the ground, I remembered something I was taught many years ago, that "the soul of man is a spark from a divine touch," and I knew then, that I could never extinguish a life.

As I stood before God this past Yom Kippur with the horror of death still fresh in my mind, I reaffirmed the Judiastic belief that killing is sinful, and if one takes anothers life, even in self defense, or while one is engaged in a just war, one is still morally liable for having killed, and still must bear the guilt of personal responsibility.

Personal responsibility is very clear in Jewish teachings. Man is never absolved of the sin of bringing harm to another. It is his personal responsibility to God not to do so. You have a choice, and therefore you must pay the consequences. "Just following orders" is no basis for justification. There is no justification for transfer of responsibility. With the knowledge that I could never willingly kill anyone, it was my most recent training that served as the catalyst which solidified my beliefs on participation in war in any form. I have been selected to perform as a member of the Phoenix Program. This involves the elimination of human lives and is directly counter to my religious beliefs of conscientious objection. It is because of this that I am prevented from continuing military service with good conscience.

He also sets forth quotations from the Old Testament and statements of modern Jewish leaders against war and the moral right of a conscientious objector to refrain from participation in warfare. Letters which Cohn attaches from a rabbi who had known and counselled him over the four-year period prior to December, 1968 and from other persons at-

test without reservation to his integrity and honesty.

In an official Army communication dated December 4, 1968, Captain Dresin, an Army chaplain, expressed his views as follows:

1. Under the provisions of AR 635–20 4a(4)c., I have counseled Lt. Michael J. Cohn.

2. My impressions of this officer are those of a mature and responsible individual, fully aware of his responsibilities to his country, but also extremely sincere in his claim of conscientious objection.

3. In interviewing Lt. Cohn, I find his objection to participation in war of any form to be based on a belief in the sacredness of human life, rooted in his interpretation and understanding of Judaism and Jewish ethics.

Also on December 4, 1968, Colonel Moten, the same Army psychiatrist who examined Reitemeyer, wrote, in part, in the course of his report, in which he found "no signs, symptoms or indications of mental illness":

This 24 year old 2LT with some 22 months active duty was seen in the Mental Hygiene Consultation Division at the request of his Commander as a result of revealing serious conscientious objections to his service in Viet Nam. The subject officer was commissioned in the ROTC and assigned to the Air Defense Command prior to receiving orders for Viet Nam and was sent to Fort Holabird for an intelligence course prior to moving to Viet Nam. While there he developed feelings of moral repugnance and inability to comply with certain aspects of what possibly might be required of him. At this time he does not feel that he could serve in Viet Nam in anything other than a non-combatant capacity and feels that he is a political pacifist. He does not apparently seem disloyal to the United States in the true sense of the word but more specifically unable to accept certain unpleasant aspects of the realities in Southeast Asia.

On December 9, 1968, Cohn wrote to Colonel Moten, stating:

I wish to point out certain discrepancies in the Pertinent History section of your 4 Dec 68 Report of Psychiatric Evaluation of our interview on 3 Dec. 68.

The report states that the interview was the result of my revealing conscientious objection to service in Viet Nam rather than conscientious objection to participation in any war, which was my actual claim.

It also states that I was commissioned in the ROTC, when in fact, I was commissioned upon completion of Artillery OCS.

The report states that I did not feel that I could serve in Viet Nam in anything other than a non-combatant capacity. In actuality, my expressed feelings then and now are that I could no longer continue to serve in the military in any capacity.

Thank you for noting these discrepancies. The record does not disclose any further comment or action by Colonel Moten.

Cohn, like Reitemeyer, was interviewed by Captain Wise. Cohn's counsel was with him at the interview. Captain Wise, on December 10, 1968, after noting Cohn's statement of opposition to all wars and that he "would not function as a non-combatant in military service," wrote:

I recommend disapproval of his request for discharge by reason of conscientious objection. I further recommend that the orders assigning 2LT Cohn to RVN be rescinded and that he not be assigned to any hostile fire area.

These recommendations are prompted by my belief that 2LT Cohn is sincere in his claim of conscientious objection. However the chronology and formulation of his convictions plus the fact that he sought and re-

ceived counsel from an organization known as the Central Committee for Conscientious Objectors indicates his views to be essentially philosophical or based on personal morals.

Although I find his objections to participation in war sincere in every respect, I believe his rational[e] for this objection to be misguided.[6a]

On December 11, 1968, Cohn's Commanding Officer forwarded, through channels, his recommendation that Cohn's request be refused, and stated in part:

* * * However sincere in his personal beliefs and moral convictions, it is believed that his basis of religious training in Judaism is not sufficient basis for request. 2LT Cohn has spent 22 months in the service, completed basic training, attended OCS, and subsequently assignment to an air defense artillery unit and has just arrived at the fact that his personal beliefs are in conflict with US Army policies. After receiving training of a more violent nature prior to attendance at US Army Intelligence School, it is inconceivable that his training at this installation was of such a nature to have solidified his beliefs. 2LT Cohn should be required to complete his active duty obligation.

On December 11, 1968, the Commandant at the Military Intelligence School at Fort Holabird also recommended disapproval, stating:

2LT Cohn enlisted in the US Army and volunteered for Officers Candidate School during which he was trained in the military arts and sciences without apparent objection. The basic mission of the US Army must have been apparent to him. In his request, LT Cohn states that the deaths of a grandfather and an uncle in approximately June 1968 solidified his objection to taking a life. He did not declare his belief at that time.

The sincerity of his conscientious objection is doubtful.

On January 9, 1969, General Hershey wrote a letter with regard to Cohn which was identical with his letter of the same date about Reitemeyer.

Between January 13, 1969 and January 16, 1969, three members of the Army Board of Review wrote as follows:

Recommend disapproval. I find it difficult to believe this individual, after a year of ROTC and 22 months service, to include Voluntary OCS and assignment at the AD Center, did not know the mission of the Army. He seems to interpret his religion to fit his own needs and practice it when the mood strikes him.

. . . . . .

I don't see a sincere *religious* basis to the request. Disapprove.

. . . . . .

Disapproved: Objection apparently based on sincerely held *personal moral code.* [Emphasis in originals.]

On January 16, 1969, the Reviewing Officer wrote:

Disapproved. Objection to service is based upon personal moral code.

On January 17, 1969, the Adjutant General notified Cohn:

Your request for separation based on conscientious objection has been disapproved. It has been determined that your objection is based upon personal moral code, not religion. In reaching this decision, consideration was given to an advisory opinion furnished by the Director of Selective Service. You will be retained in the military service, subject to normal duty assignment.

Given the definitions of what constitutes religious belief as those definitions are set forth in *Seeger* and *Brooks*, the findings of sincerity by Captains Wise and Dresin, and the absence of any indication in the record of lack of sincerity,

---

**6a.** Captain Wise used the same words in his report of his interview with Reitemeyer. *See* p. 1217, *supra.*

integrity or honesty (and indeed nothing but indications to the contrary), this Court concludes that Cohn, like Reitemeyer, is entitled to the discharge he seeks.

### Elliott

Elliott, a reservist whose unit was called to active duty in 1968, at Fort Meade, Maryland, first applied for a discharge as a conscientious objector on either October 15, 1968 or October 16, 1968. Therein he stated that his beliefs would not permit him to engage in essential civilian employment under the Selective Service program.[7]

Elliott's application reveals that he was born a Jew, and had early religious training at his family's Temple. In essence, he sets forth his understanding that the Jewish-Christian teachings, including the Commandment, "Thou Shalt Not Kill," forbid the waging of war. He states that he does not "recall most of my formal religious education" and: "Much of my belief is based on the works of many men in religion and other fields," particularly Mark Twain. He names two Cleveland area rabbis and "Samuel Clemens, 'Mark Twain'" as the individuals upon whom he "relies most for religious guidance" in matters of conviction relating to his claim. The record does not disclose any communication with Elliott by any of these persons. In fact, while Elliott refers in his application to his views being known by a number of persons and names some of them, including one of the two aforementioned rabbis, as "persons who could supply information as to the sincerity of [his] professed convictions regarding participation in war," he attached no letters to his application. The overtones as well as the precise words of Elliott's application reveal a protest against current society, but little of conviction resting on formalized, or on informal personal, religious philosophy.

On October 17, 1968, after interviewing Elliott at Fort Meade, Maryland, Captain Wells, an Army chaplain whom Elliott states he understands "to be a Presbyterian minister," stated:

PFC Elliott's objection is basically political rather than religious.

7. It is totally inconsistent with my beliefs to subject myself willingly to serving in any capacity which furthers the effort of a war making device. This must be examined in the very broadest of terms. For truly if one is to examine our structure in miniscule detail we cannot by any stretch of the mind overlook the fact that we are not permitted the right, in our structure of "not to serve." Our society, by endowment of the constitution allows for congress to raise and maintain armies. Commensurate with this allowance it is necessary for many social encumbrances among which are the draft, and taxes. The draft provides resources through our young citizens to feed the war machine and the taxes which are put upon all, regardless of desire or ability to serve, are used to outfit and maintain it. It is impossible in this sort of a structure not to serve it even if one does not wish to. Total abstention from the system leaves only two avenues of retreat. One is physically removing one's self from the system, and the other is risking incarceration for nonsupport. I find since my personal ties et al. and my business relations along with a desire to be a free agent of myself and God make it necessary to prostitute my ideals to an irritating degree, even though minor, and I compel myself to pay the taxes in order that I may remain in a state of unrestricted freedom of movement about my environment, however, I do it grudgingly and with must distaste. Beyond this minor sour pill I must swallow, I refuse to serve the system further in any way whatsoever. And in enlarging this point I cannot thereby allow myself to consent to an order involving my paying any work service to this cause in any form by any bureaucratic agency of this system.

\* \* \* \* \*

To briefly reiterate my views as outlined in subsection (1), section (L), item (1), above, it is in conflict with my beliefs that I assist in any way the furtherance or maintaniance [sic] of a war making device, I therefore would be unwilling to serve in a position encompassed by civilian employment involved with the operating, maintaining, or sustaining any post or other area involved in the furtherance of waging war.

It is my opinion that PFC Elliott's sincerity is limited to avoiding assignment in Vietnam.

On that same day, Colonel Moten, the same Army psychiatrist who interviewed Reitemeyer and Cohn, wrote:

This EM [*sic*] was well oriented, coherent and rational during the interview and gave no evidence of abnormal thinking or behavior. Affect and mood appropriate to interview. Social Judgment, good. Insight, good.

This individual exhibits good social judgement, rational thinking and does not present any mental illness that would preclude proper functioning in his unit.

Further on October 17, 1968, Elliott was interviewed by Captain Kebhart,[8] the officer who performed in Elliott's case the functions performed by Captain Wise in the Reitemeyer and Cohn cases. Kebhart set forth his recommendation as follows:

I recommend disapproval of the request.

It is my opinion that PFC Elliott is not a bona-fide conscientious objector and that his views amount to a personal moral code and philosophy. I do not think his views require a level of self-compromise that he be relieved of his orders to Vietnam or discharged from the service.

On November 21, 1968, after several other Army officers, who reviewed only the record and did not personally interview Elliott, recommended disapproval, and after Selective Service advised the Army that he would not be classified as a conscientious objector if he were being considered for Selective Service, Elliott's application was disapproved by the Army as "not based upon religious training or belief." Elliott alleges that he has never been formally informed of the denial of his application.

After Elliott was orally advised of the above denial of his October, 1968 request for discharge, Elliott sought further review and again requested discharge as a conscientious objector. In his latest request, Elliott stated:

I did not make application for discharge as a conscientious objector prior to entry on active duty because I was willing then to go along with the milieu and at the time it seemed that I was not really contributing to a concerted effort as a reservist in the military machine.

---

8. Elliott alleges in his complaint that Captain Kebhart had only "one prior exposure to an application for conscientious objector status." But that alone does not make him unqualified. There always is a "first" performance by each of us.

Elliott complains that he was not specifically advised of his right to have counsel present when he was interviewed. A.R. 635–20.4(d) reads: "The applicant will be afforded an opportunity to appear in person (with counsel retained by him, if he desires) before an officer in the grade of O–3, or higher," etc. The Regulation is clear. There is no requirement that the Army specifically advise an applicant of his right to have his counsel present at his appearance before the officer in grade O–3 or better. In addition, it is to be noted that Elliott is a graduate of Ohio State University. He was hardly lacking in knowledge of legal matters, and had participated as one of the plaintiffs in Morse v. Boswell, 289 F.Supp. 812 (D. Md.), aff'd, 401 F.2d 544 (4th Cir. 1968), cert. denied, 393 U.S. 1052, 89 S.Ct. 687, 21 L.Ed.2d 694 (1969), in which the petitioners alleged, *inter alia*, violation by the Government of the provisions of their reserve contracts. After the United States Court of Appeals for the Fourth Circuit affirmed this Court's decision in Morse v. Boswell on August 26, 1968, plaintiffs in that case presented applications for a stay of their orders to several Justices of the Supreme Court. Mr. Justice Douglas granted a temporary stay, but on October 7, 1968 the application for a stay presented to Mr. Justice Douglas, and by him referred to the Court, was denied. 393 U.S. 802, 89 S.Ct. 41, 21 L.Ed.2d 86 (1968). Approximately one week after the denial of the stay, but before the denial of the petition for writ of certiorari, Elliott instituted the application for 1–O status which is under consideration herein. One of his counsel, in that case, appears on his behalf herein.

Upon recall to active duty, it was not immediately apparent to me that I have become, or was becoming a conscientious objector. However, as time passed and I became more and more involved with the situation at hand relative to war, I realized that there was no alternative to the subjection of my body and spirit in the efforts of mechanized warfare upon my fellow man except conscientious objection.

In addition to the above, it required a certain amount of time to cultivate and formulate my views in the light of my religious teachings, after the recall to active duty.

Elliott, in his second application, also wrote:

As outlined in my original application for status as a conscientious objector, I stated that I steadfastly refused to perform in any way, shape or form which would or could be construed to be in assistance to the making of war on my fellow man. I have had in the past few weeks a good deal of time to reconsider some of the things which I stated then and have found room for revision and improvement and enlightenment. Room to enlarge my feelings and beliefs in light of many long discussions with others of my basic beliefs, and others who differ widely with my beliefs. It is wholly in keeping with the nature of God and man that man should strive to aid and further the efforts for peace. I am fully in belief that as we learn so we do, and that each particle of learning added to that already Learned helps, to shed light on what has gone before and has been done before. That hindsight is the foundation for foresight. Everything we do is training, and hence a part of belief. With this in mind, and a better understanding of the scope and purpose of the civilian work program there would be willingness on my part to participate, and I would agree to the issu-

ance of an order to that effect by the Selective Service board.

With his second application, Elliott submitted letters from friends and family attesting to the sincerity of his beliefs. But while he again referred to two Cleveland area rabbis, Elliott forwarded no communication from or statement by either of them.

On January 17, 1969, Elliott was interviewed by a Captain Keating, the counterpart in the Reitemeyer and Cohn cases of Captain Wise and of Captain Kebhart in connection with Elliott's first application. Captain Keating wrote:

The applicant appears to be sincere and forthright in his beliefs and convictions.

In my opinion his arguments are more politically oriented than religiously oriented and, it appears that the applicant would be more justified in applying for the status of a noncombatant, 1–A–O.[9]

On January 22, 1969, Captain Dresin, the same chaplain who counselled with Cohn, wrote:

I find Richard to be a mature and responsible individual, fully aware of his duty to his country but, on the other hand, extremely sincere in his claim of conscientious objection.

I find Richard's objection to service in the military and participation in war to be founded upon his strong belief in the sacredness of life and his views of Jewish ethical teachings.

Elliott, alleges that on January 30, 1969 he received orders to report to Fort Lewis, Washington, for shipment to Vietnam.

On February 4, 1969, Elliott instituted his proceeding in this Court. On February 12, 1969, Elliott's second application was submitted for the first time to the Adjutant General and was on February 14, 1969 formally disapproved as not "based upon sincere religious belief and training."

9. 1–A–O status is discussed, *infra* at pp. 1229–1230 of this opinion, in some detail in connection with Quaglia's petition.

■ In oral argument in this Court, Elliott's counsel urged that the views expressed by those who interviewed Elliott after he filed his first application for discharge as a conscientious objector should be disregarded because they were reached in an atmosphere unfriendly to Elliott due to his participation as a plaintiff-reservist in *Morse v. Boswell*, 289 F.Supp. 812 (D.Md.), aff'd, 401 F. 2d 544 (4th Cir. 1968), cert. denied, 393 U.S. 1052, 89 S.Ct. 687, 21 L.Ed.2d 694 (1969). There would seem to be no reason why the Army cannot consider all of the recommendations of Elliott's interviewers during the period which followed the submission of his first request for discharge in October, 1968. The naked allegation of Elliott's counsel during oral argument in this Court that Elliott did not receive a fair deal the first time around is buttressed by no proof and does not require the elimination from consideration of the impressions formed by Elliott's initial interviewers. On that basis, the record certainly is not lacking in a "basis in fact" to support the denial of the status to which Elliott contends he is entitled.

### Quaglia

Quaglia instituted his proceeding in this Court on February 13, 1969. Quaglia was born on February 12, 1946; his father was a Roman Catholic, his mother a Protestant. He states in his first application for classification as a conscientious objector that during the first eleven years of his life, he:

> practiced Protestantism as a faithful member of my local church. I received from that my foundation of Christian thought and belief. All my religious training from that point until this day has come from the guidance and example of my parents. I have not practiced either faith since childhood.

Quaglia enlisted in the Army Reserves in March, 1967. He wrote in his application that during his initial training on active duty, he twice refused minor positions of leadership. He was released from active duty in October, 1967. At some time during 1967, either before or after his service, he attended Massachusetts Bay Community College. On May 13, 1968, his reserve unit was called to active duty at Fort Meade, Maryland, and he was assigned duty as a supply clerk in a headquarters company in a maintenance battalion. From oral argument by counsel, this Court has learned that Quaglia's battalion was an ordinance unit which performed maintenance work on artillery pieces.

On August 17, 1968, Quaglia married a girl he had known for about two years. Shortly thereafter, he initiated action to obtain reclassification as a conscientious objector. In his application, Quaglia stated that if discharged he would be willing to work under the Selective Service Conscientious Objector's Work Program. Further, in his application, he reviewed his early religious training and stated how he had come to hold his present religious convictions against war. He listed a number of persons who could confirm his adherence to, and the sincerity and depth of, these views; and attached a number of letters from some of those persons, which do indeed support that claim. One from an assistant professor of philosophy at a Massachusetts state college relates his long-time relationship with the Quaglia family and with David Quaglia himself. He describes the family's intellectual interests, their moral and philosophical convictions, and their implementation of these convictions. He notes that from boyhood Quaglia:

> was always the peacemaker, breaking up fights, but *never initiating* them. In fact I have never known David to do violence to anyone. Never from any of his friends has there been even an accusation of violence or dishonesty, * * *.

> \* \* \* \* \* \*

One of David's friends is a classical example of a military personality. Violence, and even cruelty, was a hallmark of his youth. He entered the U.S. Marines, served for four years, and is now a policeman. Even though there were personality conflicts, this person has the greatest respect for David. This indicates, at least to me, that David can, by virtue of honesty and a sense for life, earn the respect of those whose lives run diametric to his.

\*　　\*　　\*　　\*　　\*　　\*

I know better than most the forces that animate him, and I believe that this person will greatly contribute to the moral, intellectual and creative aspects of the American society. He has no place in the military structure of any nation, and I hope very much that your decision will weigh in his favor. [Emphasis appears in the professor's letter.]

On September 20, 1968, Quaglia was interviewed by Captain Benzing, a Protestant chaplain, who wrote:

PFC David P. Quagla [sic] has developed his objection to war or participation in war over the past several years. He is sincere in his convictions. While he does not claim affiliation to any particular denomination, his conviction is based upon religious beliefs as he interprets them from the teachings of Christ. Though I do not agree with PFC Quagla's [sic] position, I do not question his sincerity.

PFC David P. Quagla [sic] states that he is willing to serve in other capacities in the U.S. Army as a noncombatant. Recommend that action be initiated under provisions of AR 600-200.

On October 15, 1968, Captain Perliss, an Army psychiatrist, examined Quaglia and filed the following "Medical Statement":

This 22 year old, white, male is referred for psychiatric evaluation regarding his status as conscientious objector as ascribed by Article 635-20. Individual was not aware of his objections until he entered the military. He expresses fear of being hurt and wonders about his control in hurting other people. These feelings are not new and he appears to exhibit self-control with these feelings. Individual exhibits good social judgement, rational thinking and does not present any mental illness that would preclude proper functioning in his unit.

On October 18, 1968, Captain Keating, performing the function Captain Wise performed in the Reitemeyer and Cohn cases and that he (Captain Keating) performed in connection with Elliott's second application, recommended that:

the application be favorably considered. I believe the man to have a strong personal conviction against the use of arms in combat based upon religious grounds.

Also on October 18, 1968, Quaglia himself filed the following statement:

I request reclassification as a conscientious objector, non-combatant (1-A-O) under AR 600-200.

I am willing to serve my country in the Armed Services as a non-combatant. I am willing to join my unit in Vietnam but as a non-combatant.

Quaglia's request was approved for 1-A-O status on October 28, 1968, and he was so classified. During oral argument in this Court, Quaglia's counsel stated that a couple of weeks after Quaglia was so classified, Quaglia was informed that he would be transferred to a medical or social service unit. However, his assignment as a supply clerk was not changed.

Respondents have submitted to this Court three Army regulations, namely, AR 614-260, dated December 3, 1962; AR 600-200, dated May 28, 1968; and AR 135-25, dated August 30, 1968. Quaglia's complaint also cites and quotes from Executive Order No. 10028. Al-

though the provisions of those documents, as respondents have admitted, are not entirely consistent, in essence they provide that the 1-O classification is available to those who, on religious grounds, are conscientiously opposed to participation to war in any form, and that the 1-A-O classification is available to those who, on religious grounds, are opposed to combatant training or duty in the Armed Services. A man who is classified as 1-O is entitled to be discharged from the Service. It is that classification which Reitemeyer, Cohn and Elliott have been seeking. On the other hand, Quaglia, on October 18, 1968, himself wrote, with regard to his August, 1968 application, that he sought only non-combatant status, i. e., 1-A-O. Interpreting the regulations concerning 1-A-O status most favorably to Quaglia, they define non-combatant duty to include duty with a unit unarmed at all times; duty in the medical department; and duty, the primary function of which does not require the use of arms, provided that the assignment is acceptable to the individual and does not require him to bear arms or be trained in their use.

On January 28, 1969, Quaglia filed an application for separation from the Army as a conscientious objector under D.O.D. 1300.6 and AR 635-20, i. e., for 1-O status, as an objector to war in any form. In his request, Quaglia elaborated upon the discussion of his religious beliefs in his first application, i. e., for 1-A-O status. He repeated that his faith as a Christian pacifist required him to abstain from force and violence. He concluded:

I am morally bound not to do violence to another person, or aid in any way those whose direct or indirect actions lead to the harm or destruction of another human life. The time I have spent in the Armed Forces has not enabled me to benefit anyone directly, rather I have been put in a position to indirectly assist the cause of war. In this way, my participation, however indirect, amounts to moral consent. Such consent runs counter to what I believe to be the most fundamental Christian teaching: love and brotherhood.

My 1-A-O application was submitted in good faith. According to my understanding of that classification, I would not be required to perform or assist in any duty which ran counter to the dictates of my conscience. I have come to realize that all the classification really prohibits is the bearing of arms, thus making it impossible for me to serve as a member of the Armed Forces.

Therefore, for the reasons stated above, I request to be discharged as a conscientious objector.

Attached to Quaglia's January 28, 1969 request for discharge as a conscientious objector were copies of several of the letters attached to his request for reclassification. In addition, there were letters from others, all describing Quaglia's sincerity, sensibility, high intelligence and principles.

After an interview with Quaglia on January 22, 1969, Captain Dresin, the Army chaplain referred to earlier in this opinion, wrote:

My impression of PFC Quaglia is that of an individual cognizant of the duty he owes his country, but also sincere in his claim of Conscientious Objection.

My interview with PFC Quaglia leads me to believe that his objection to service in the military and claim of conscientious objection are legitimately derived from his interpretation and understanding of his own religious faith.

On January 29, 1969, Captain Fleming concluded after an interview:

It is my finding that PFC Quaglia's belief that he cannot participate in war is quite sincere. The basis of his convictions is rooted in religious teach-

ings and a strong conviction that war is philosophically wrong.

On January 29, 1969, Quaglia's Commanding Officer, Lt. Farnsworth, recommended disapproval of Quaglia's application:

> because this action is the same as PFC Quaglia's request for 1–A–O Classification which he was awarded. In that request, PFC Quaglia stated that he was willing to serve as a noncombatant and willing to serve with his unit in Viet Nam.

At the first of two hearings in this case, Quaglia's counsel contended that Lt. Farnsworth had shown Quaglia a letter recommending approval. Subsequently, a copy of a letter written by Lt. Farnsworth, also dated January 31, 1969, was given the Court by counsel for the Government. That letter contained the following:

> Approval is recommended because of Quaglia's sincerity and his beliefs are based on religious grounds. This command recommends that Quaglia be furnished the opportunity to perform an alternate service in community, or social work, whether or not he is able to obtain a discharge upon the grounds of conscientious objection.

Government counsel has proffered Lt. Farnsworth's explanation for the contradictory letters. The proffer was that after Lt. Farnsworth first recommended approval, he learned that Quaglia had earlier expressed a willingness to serve with his unit in Vietnam, and then decided to recommend disapproval. That proffer, as *de novo* evidence, will not be given any status in this proceeding, and is not given any weight herein.

On January 31, 1969, Lt. Col. Sims, Commanding Officer of the 47th Gen. Spt.Gp., also wrote as follows concerning Quaglia's second application:

> Recommend disapproval.

> PFC Quaglia was recently determined by the Department of Army to be eligible for classification 1–A–O. In seeking this classification he expressed in writing a willingness to serve in the Armed Forces as a noncombatant and rejoin his unit overseas. Also, his current request for discharge is supported by basically the same documents submitted with his previous request.

> My evaluation of this request reveals no significant additional evidence that would warrant reclassification as 1–O. It is my impression that PFC Quaglia is employing a series of administrative actions designed to indefinitely delay, or entirely preclude his rejoining the 513th Maintenance Battalion (DS).

> Request expedited processing of this request.

On February 14, 1969, the Selective Service System, after reviewing the file, forwarded an opinion that Quaglia would be classified by the Service as 1–A–O if he were being considered for classification at that time.

On February 14, 1969, the Army disapproved Quaglia's request for separation commenting:

> Evidence in this case does not show a change in religious beliefs which would justify a change in applicant's classification as a non-combatant.

Quaglia seeks in his second application and in his complaint in this Court discharge from the Army. Herein, he does not complain that his present assignment fails to afford him appropriate non-combatant duty.[10] In this Court's

---

10. Like Reitemeyer and Cohn, Quaglia has filed a proffer in which he alleges that if permitted to testify in this Court, he would testify that as late as Christmas, 1968, he had been led by Captain Keating, and earlier by Chaplain Benzing, to believe that he would be given retraining as an Army medic. This Court, while refusing the proffer, notes its consistency with the record and with Quaglia's own allegations in his complaint in this proceeding.

**1232**

opinion, there is ample basis in fact in the record to support the contention that Quaglia is not opposed to war in any form. For example, although the record does reveal the complete and almost unquestioned sincerity of Quaglia's views as a conscientious objector, nowhere is there evidence that Quaglia's religious views have become so intense that he cannot serve in the Army as a medic or social worker. As stated above, Quaglia does not ask this Court to inquire into whether the Army is not affording him an opportunity to perform appropriate non-combatant duty or to determine whether the Army is violating its own non-combatant duty regulations. Instead, he asks this Court only to require the Army to grant him 1–O status. Quaglia, in this Court's view, is not entitled to such relief. There is not lacking in this case "basis in fact" for the Army's refusal to discharge Quaglia as a conscientious objector to war in any form and for its decision to retain him as a conscientious objector for non-combatant duty. In so holding, this Court expresses no view as to whether the Army has failed to provide Quaglia with non-combatant duty within the 1–A–O classification as required by its own regulations, or whether Quaglia would be entitled to relief from a federal court because of such failure if such failure does exist.

For the reasons stated in this opinion, (1) Elliott's and Quaglia's petitions for habeas corpus relief are hereby denied; and (2) Reitemeyer's and Cohn's petitions for such relief are hereby granted. If the Army does not file an appeal from this Court's holding in the *Reitemeyer* case to the United States Court of Appeals for the Fourth Circuit within the time provided for such appeal, the Army should grant the appropriate discharge; otherwise, this Court will issue a writ of habeas corpus in connection with Reitemeyer's status. The comments made in the preceding sentence with regard to Reitemeyer are equally applicable in Cohn's case.