**UNITED STATES of America ex rel. Robert A. PARSLEY, Relator,**

v.

**Lloyd R. MOSES, Brigadier General, U. S. A., Commanding Officer at Fort Dix, New Jersey, and/or Any Other Officer or Personnel of the United States Army at Fort Dix, New Jersey, Having Custody of the Relator, Respondent.**

Civ. No. 59–56.

United States District Court
D. New Jersey.

Feb. 27, 1956.

A. Robert Swanson, Jersey City, N. J., for relator. Steinberg, Friedman & Blau, New York City, of counsel.

Raymond Del Tufo, Jr., U. S. Atty., by George H. Barlow, Asst. U. S. Atty., Trenton, N. J., for respondent.

FORMAN, Chief Judge.

Relator, Robert A. Parsley, enlisted in the United States Army on August 15, 1950 for a term of three years. On January 3, 1951 relator absented himself without leave from the Army and made his way from his station at Fort Knox, Kentucky to Reno, Nevada. Reno was his destination because he had conceived a scheme which he thought would enable him to accumulate a fortune at roulette.

Like many predecessor research workers in this field, he soon found himself stranded in Reno without money. At this juncture, apparently, Army life once again seemed inviting, and, on January 7, 1951, relator surrendered him-

self to the Reno police as a soldier absent without leave. The police provided him with accommodations and contacted the local office of the Federal Bureau of Investigation, which, in turn, contacted Fort Knox, Kentucky. The reply from Fort Knox was that relator was "not wanted" there and accordingly upon authority obtained from the Federal Bureau of Investigation the Reno police released him. He then made an unsuccessful attempt to get the local Red Cross to provide him with transportation back to Fort Knox.

Relator obtained a few menial jobs in the Reno vicinity and eventually reached Seattle, Washington, where he resumed his civilian occupation of ship's radio officer.

On September 16, 1955, while relator was serving aboard a ship docked in New York harbor Army personnel took him into custody and transported him to Fort Dix, New Jersey. On November 18, 1955 relator was tried by a general court-martial at Fort Dix on a charge that he deserted on January 3, 1951. He pleaded guilty to the lesser charge of being absent without leave from January 3, 1951 to January 7, 1951, the day he surrendered himself to the Reno police. After trial he was found guilty of being absent without leave from January 3, 1951 to September 16, 1955.[1] Relator was sentenced to serve 30 days at hard labor and to forfeit $55. The sentence has been served.

During the period of his absence from the Army relator made no effort to conceal either his identity or his whereabouts.

Under 10 U.S.C.A. § 629 the Army has authority to add to a soldier's term of enlistment so-called "bad time"—time during which the enlistee has unauthorizedly absented himself from duty.[2] However, the total amount of service that can be required may not exceed in length the original term of enlistment. Thus, relator is presently being required to serve the time that remained in his enlistment term after he absented himself from the Army on January 3, 1951. Relator's "bad time" amounts to about two years and seven months, since his original term expired on August 15, 1953.

It is relator's position that the Army lacks legal authority to hold him until he finishes the remainder of his three-year enlistment term. Upon the submission of a petition containing substantially all of the above facts, which the Army concedes to be an accurate description of the course of events, a writ of habeas corpus was issued, testimony taken and oral argument heard.

**I**

The first issue that must be met is whether the Army had jurisdic-

---

1. Relator's petition for the writ alleged that the net result of the court-martial was to find him guilty of being absent without leave for only the four days between his departure from Fort Knox on January 3, 1951 and his surrender to the Reno police on January 7, 1951. The Army took a contrary position and at the hearing produced conclusive proof that the court-martial, after accepting relator's plea of guilty to being absent without leave from January 3 to January 7, 1951, had proceeded to find him guilty of being absent without leave from January 3, 1951 to September 16, 1955.

2. "Every soldier who in an existing or subsequent enlistment deserts the service of the United States or without proper authority absents himself from his organization, station, or duty for more than one day, or who is confined for more than one day under sentence, or while awaiting trial and disposition of his case, if the trial results in conviction, or through the intemperate use of drugs or alcoholic liquor, or through disease or injury the result of his own misconduct, renders himself unable for more than one day to perform duty, shall be liable to serve, after his return to a full-duty status, for such period as shall, with the time he may have served prior to such desertion, unauthorized absence, confinement, or inability to perform duty, amount to the full term of that part of his enlistment period which he is required to serve with his organization before being furloughed to the Army reserve." 10 U.S.C.A. § 629.

tion to reacquire custody of relator and thus to apply 10 U.S.C.A. § 629 to him.

In United States ex rel. Toth v. Quarles, 1955, 350 U.S. 11, 76 S.Ct. 1, the Supreme Court held, in dealing with a discharged soldier, that Congress lacks constitutional power to provide for military trial of civilians for crimes committed while in their former status as servicemen. Once a soldier's status has changed from soldier to civilian there is no courts-martial jurisdiction for the trial of crimes committed prior to the status-changing separation from the Armed Services. Future prosecution of civilians for their crimes committed while in the military must be by civilian courts subject to all the provisions of the Bill of Rights. United States ex rel. Toth v. Quarles, supra.

The Toth case stands for the proposition that once a soldier's status changes from that of soldier to that of civilian, military jurisdiction is lost and cannot be regained. It is apparent that that case will apply to relator only if at the time of the reacquisition of custody over him by the Army his status had changed to that of civilian. The issue becomes: Did his status change to that of civilian upon the expiration of his original term of enlistment? This requires an examination of the relationship between an enlisted man and the Army.

■ "Enlistment is a contract, but it is one of those contracts which changes the status, and where that is changed, no breach of the contract destroys the new status or relieves from the obligations which its existence imposes." In re Grimley, 1890, 137 U.S. 147, 151, 11 S.Ct. 54, 55, 34 L.Ed. 636. Discharge, of course, changes the status and turns a soldier into a civilian. Can it be said that the simple passage of time beyond the expiration date of the original term of enlistment creates the same effect?

In 1876 Attorney General Taft, in an opinion addressed to the then Secretary of War, construed the military contract of enlistment (absent statutory direc-

tions to the contrary) to impose a duty to serve only during the specific years covered by the contract. There was thought to be no duty to serve beyond the terminal date of the contractual period even if the enlistee deserted during his term and remained a deserter when the terminal date of the enlistment period was reached. 15 Op.Atty. Gen. 152, 161–163. Accord: NCM 133, Taylor, 4 CMR 450, 452 (1952).

In 1922 Attorney General Daugherty disagreed with his predecessor. In an opinion addressed to the then Secretary of the Navy he examined the contract of enlistment and found that "The contract is to *serve* for a certain period, and the status established is that of a soldier or sailor in the military service of the United States. * * * It is a contradiction in terms to say that this contract of service can be performed by desertion; that this status can be dissolved at the will of the enlisted man. The obligation can only be ended by complete performance, and the status is only satisfied by the prescribed continuous relationship of service." 33 Op.Atty.Gen. 121, 127–128. He further held that "There must be, in my judgment, some further act, such as a discharge, to terminate the actual state of service in which the contract of enlistment places the soldier or sailor." 33 Op.Atty.Gen. at page 129.

■ It is the latter interpretation of the military contract of enlistment that has found favor with the majority of civilian and military courts that have passed upon the problem. Two Federal District Courts have agreed with it, Ex parte Clark, D.C.E.D.N.Y.1921, 271 F. 533 and Ex parte Wilson, D.C.E.D.Va. 1929, 33 F.2d 214, as has the Court of Claims, Peiffer v. United States, 1942, 96 Ct.Cl. 344 and the United States Court of Military Appeals, United States v. Klunk, 11 CMR 92 (USCMA 1953); see also United States v. Downs, 11 CMR 90 (USCMA 1953); United States v. Barrett, 12 CMR 50 (USCMA 1953); CGCM 9737, Wilbert J. Meyer, 1 CMR 562 (1951). Any other construction of

the enlistment contract would imperil military discipline. Furthermore, Attorney General Taft's interpretation of the enlistment contract runs counter to the provisions of 10 U.S.C.A. § 652a, which provides that no enlisted person shall be discharged without a certificate of discharge and, if the discharge is to take place before the enlistment term expires, in that event it must be in conformity with the rules prescribed by the Secretary of the Army or the sentence of a general or special court-martial. This statute clearly contemplates a necessity for official military action before the cessation of an enlisted man's obligation to serve. A member of the Armed Forces cannot discharge himself. It must be concluded that the Army had jurisdiction to regain custody of the relator and therefore to apply the provisions of 10 U.S.C.A. § 629 to him.

## II

Relator also argues that he was deprived of procedural due process by use of the administrative procedure utilized by the Army in computing the amount of his "bad time".

In his opinion cited supra, Attorney General Taft wrote of an extension statute like 10 U.S.C.A. § 629. He said:

"This provision, however, is to be construed along with the other penal provisions relating to the offense of desertion, all of which contemplate a trial and conviction before the infliction of the penalty. * * * It comes into play only after a conviction. * * *" 15 Op.Atty.Gen. at page 162.

It does not appear, however, that the Army follows the edict of Attorney General Taft. Under applicable Army regulations the power created by 10 U.S.C.A. § 629 may be used independently of a court-martial conviction for unauthorized absence. Army Regulation 640–201 prescribes the procedures and method to be used in keeping a record of absence which will later be the basis for computing the amount of time to be added to the enlistment term. Army Regula-

tion 35–1030 prescribes rules pertaining to pay for men said to be unauthorizedly absent and provides:

"1. Determination of character of absence.—a. In case of absence from duty * * * the question whether such absence is or is not authorized * * * is for administrative determination.

"b. The acquittal of an accused by a court-martial of a charge of desertion or absence without leave or, in case of conviction, the disapproval of the findings by the convening authority affects only the disciplinary aspect of his absence and does not in itself prevent an administrative determination that he was in fact absent without authority, and, accordingly, is not entitled to pay for the period of his unauthorized absence * * *."

If the record of absence erroneously reports that the absence is unauthorized, or if it turns out that the individual involved has a legitimate excuse for his absence, AR 630–10, para. 10 provides a mechanism through which the erroneous entry can be corrected.

Thus, it appears that there are two facets to every unauthorized absence from the Army. One concerns liability to court-martial for punishment and is akin to the criminal liability to which a wrongdoer is exposed in civilian courts. The other is a liability to make good time lost through unauthorized absence and is analogous to civil liability for breach of contract. When Army authorities set about determining the latter liability of a soldier Army regulations do not bind them by the results of a court-martial, or even require that one be held before an enlistment may be extended under 10 U.S.C.A. § 629.

A fair reading of that section as presently worded (see note 2, supra) demonstrates that a proper construction of it is one that will permit the Army to apply its terms to a soldier who has not been court-martialed. If Congress had desired to make a court-martial convic-

tion a necessary prerequisite before 10 U.S.C.A. § 629 could be applied it would have been much simpler for it to say so than to enact the statute as it is written. By listing specifically the culpable conduct leading to time lost that the Army may require to be made up Congress indicated that the determination of time lost for purposes of extending enlistment terms under 10 U.S.C.A. § 629 was a task to be performed by military administrative rather than military judicial authorities.

There can be no violation of due process in providing for this administrative method of computing "bad time". Without deciding whether the due process clause applies to military administrative determinations, and, if it applies, to what extent,[3] it is plain that relator can make no complaint as long as he is given an opportunity to be heard in the event that he feels the computation is erroneous or that the absence was in fact not an unauthorized one. And ample opportunity is given for an aggrieved soldier to be heard. Under Article 138 of the Uniform Code of Military Justice, 50 U.S.C.A. § 734, it is provided:

> "Any member of the armed forces who believes himself wronged by his commanding officer, and, upon due application to such commander, is refused redress, may complain to any superior officer who shall forward the complaint to the officer exercising general court-martial jurisdiction over the officer against whom it is made. That officer shall examine into said complaint and take proper measures for redressing the wrong complained of; and he shall, as soon as possible, transmit to the Department concerned a true statement of such complaint, with the proceedings had thereon." 50 U.S.C.A. § 734.

 Relator's particular contention is that the administrative authority

computed the length of his unauthorized absence in ignorance of the true facts concerning his willingness to return to the Army during January 1951, and his consequent frustration in that purpose by the erroneous report from Fort Knox that he was "not wanted". Furthermore, he asserts that his good faith in believing that the Army had released him should be taken into consideration by the administrative authority. Since neither of these facts was sufficient to prevent his court-martial conviction for unauthorized absence it is difficult to see how they can rationally be expected to move an officer into diminishing the length of his "bad time". But the short answer to relator's argument is to point out that if these facts were not considered in computing the length of his "bad time" it is a defect of his own making. He never took steps to put them before the administrative authority who calculated his "bad time". The proper mechanism for him to use to secure a recomputation of the time he must make up by an authority with these additional facts before him is Article 138. It is no violation of the fundamental fairness due process requires for relator to bear the burden of going forward once the Army's records make out a prima facie case of unauthorized absence.

### III

Relator's final argument is that he was relieved from his obligation to serve by the Army when it, acting through the Federal Bureau of Investigation and the Reno police, told him he was "not wanted". Two theories are relied on in support of this argument: (1) that his release by the Reno police was actually a release from military custody which is binding on the Army and (2) that it is now estopped from asserting a contrary position.

 Under 10 U.S.C.A. § 652a "No enlisted person, lawfully inducted

3. See the various opinions in Burns v. Wilson, 1953, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508, and especially the opinion of Justice Frankfurter on the application for rehearing, 346 U.S. 844, 74 S.Ct. 3, 98 L.Ed. 363.

into the military service of the United States, shall be discharged from said service without a certificate of discharge, and no enlisted person shall be discharged from said service before his term of service has expired, except in the manner prescribed by the Secretary of the Department of the Army, or by sentence of a general or special court-martial." Civilian police officers are authorized by 50 U.S.C.A. § 562 to apprehend deserters from the Armed Forces of the United States and to deliver them into the custody of military officials. But this is as far as their authority goes. There is no authority in civilian police or the Federal Bureau of Investigation to act as an agency of the Army in the granting of discharges. Only a discharge could relieve relator of his obligations to the Army and it was beyond the power of the Army to authorize the Reno police to give him one.

Nor can the relator validly assert the theory that the Reno police had apparent authority to release him from his obligation to the Army, and that the Army will not now be heard to deny the existence of that authority. The facts in this case present nothing from which a reasonable inference can be drawn that the Army so authorized the Reno police. Such was not ordinary `usage. See American Well Works v. Royal Indemnity Co., 109 N.J.L. 104, 108, 160 A. 560 (E. & A.1932). Indeed, the facts are only consistent with the hypothesis that the Army had made an error in notifying the Federal Bureau of Investigation and the Reno police that the relator was "not wanted". This is the inference that a reasonable man in relator's position would have made, and is quite probably the one he did make, for he admits that after being rejected by the Reno police he then requested the local Red Cross to transport him back to Fort Knox. Concededly he was prevented from reporting to the station where he belonged only by his own misconduct in unauthorizedly leaving there and by vol-

untarily depriving himself of the financial means to pay for his return transportation thereto.

The writ is discharged and the relator remanded to custody.