**On the Application of Michael
W. ROBERTS**

v.

**COMMANDING GENERAL, Fort George
G. Meade, Maryland,**

Civ. No. 70–305.

United States District Court,
D. Maryland.

June 9, 1970.

As Amended Sept. 25, 1970.

Roland Walker and Richard S. Kahn, Baltimore, Md., for plaintiff.

Stephen H. Sachs, U. S. Atty., and Charles G. Bernstein, Asst. U. S. Atty., for defendant.

FRANK A. KAUFMAN, District Judge.

Roberts' petition for habeas corpus relief raises issues concerning the obligations of a soldier after "[t]he Army lost [him] in its vast organization," Beaty v. Kenan, 420 F.2d 55, 59 (9th Cir. 1969), and the right of the Army, pursuant to 10 U.S.C. § 972,[1] to require such a sol-

---

1. 10 U.S.C. § 972 provides, in part, as follows:

An enlisted member of an armed force who (1) deserts; (2) is absent from his

dier to serve a period of duty beyond the term for which he was inducted. While there is no material dispute concerning the facts in this case, the differences between the factual circumstances herein and in three other cases involving substantially the same issue—Beaty v. Kenan, *supra*; Patnode v. Alexander et al., No. 70–98–H, Civil (D.Md., May 6, 1970), Harvey, J., unpublished oral opinion; McFarlane v. De Young, 311 F. Supp. 321 (N.D.Cal., 1970), Levin, J.—[2] are of considerable importance.[3]

Roberts, a Baltimorean, was inducted into the Army on March 12, 1968 for a two-year term. On February 1, 1969, while stationed at Fort Carson, Colorado, he received orders to report to Oakland Air Terminal on February 26, 1969 for assignment to Viet Nam. While the record does not definitely reveal whether "written or oral orders"[4] were issued to Roberts, the latter alleges—and has so certified under oath—that he was given written orders by a 1st Lt. Williams to report to Oakland Air Terminal on February 26, 1969, after completion of a fifteen-day leave of absence, and was instructed by a Staff Sgt. Morris to leave those orders and all personal belongings with Morris and that Morris would send them to Roberts' home address in Baltimore, Maryland. Not having received any such orders or belongings, Roberts states that on February 24, 1969, he made three telephone calls, and on the next day, February 25, 1969, made two additional such calls, all to Fort Carson, attempting to reach Sgt. Morris. After the first four such attempts proved un-

fruitful, Roberts has affied that during the fifth telephone call, he reached and talked with Sgt. Morris who informed him that the orders and belongings had been sent, on February 5, 1969, to Roberts' home in Baltimore, and who instructed Roberts to telephone to Oakland Air Terminal, to tell them that Roberts' orders were lost, and to obtain further instructions from that Terminal. Roberts has also affied that, on February 26, 1969, he telephoned to Oakland Air Terminal and spoke with an unknown sergeant, who described himself as being in charge of the record section for overseas replacement personnel, and who, after Roberts had related to him the aforesaid events, stated there was no record at Oakland concerning Roberts and the latter should wait at his home for further orders since he could not be transferred without orders or records. A telephone bill attached by Roberts to his petition in this case supports Roberts' sworn statements that he placed the aforesaid five calls to Fort Carson and the one call to Oakland.

Roberts also has informed this Court that he arranged passage on Trans World Airlines from Baltimore to Oakland on February 26, 1969, but that he did not make that journey on February 26, 1969 because of his telephone conversations on February 25, 1969 and February 26, 1969 with Sgt. Morris and with the non-commissioned officer at Oakland. In any event, it is clear that Roberts remained at home and neither received word from, nor contacted, the Army until October 8, 1969 when he dis-

---

organization, station, or duty for more than one day without proper authority, as determined by competent authority, * * * is liable, after his return to full duty, to serve for a period that, when added to the period that he served before his absence from duty, amounts to the term for which he was enlisted or inducted.

Similar but not identical language is set forth in the Army's implementing regulation, AR 635–200, pars. 2–3. *See* n. 10 *infra*.

2. Copies of the *Patnode* and *McFarlane* opinions are included in the official file in this case.

3. The three cases are the only ones which have been brought to or have come to the attention of this Court.

4. Memorandum prepared by Lt. Col. Cook, dated April 15, 1970 accompanying the submission of the within case to the Judge Advocate General of the Army prior to a ruling therein by the Adjutant General of the Army on April 21, 1970. That document is discussed and quoted from, *infra*.

patched a registered mail letter to the Department of the Army, Pentagon, Washington, D. C., requesting instructions. Exhibits attached to Roberts' petition in this case reveal a mailing by Roberts on October 8, 1969 and the receipt thereof and the mailing of a return receipt on October 11, 1969. Roberts apparently kept no copy of his October 8, 1969 letter and the Army has not produced the same or informed this Court if the Army has located it. However, the record in this case does contain a copy of the following October 18, 1969 Western Union telegram from the Army dispatched from Washington, D. C., to Roberts:

1. This office in receipt of your letter, postmarked 8 Oct 69, concerning your current assignment status.

2. Before any assistance may be provided you regarding this matter; it is necessary that you return to military control. Therefore, it is suggested that you report to the special processing detachment at the nearest Army installation as soon as possible. Upon your arrival your disposition will be determined by authorities at that installation and assistance will be provided to alleviate your problem.

On October 20, 1969, Roberts reported to Fort Meade, Maryland, gave them the telegram, and, according to Roberts, was told:

This is the first time I ever heard of anything like this; you're not AWOL so we can't take you here.

Roberts then states that he went home, further pondered the situation, and, on October 27, 1969, seven days after his wife had a premature baby who died on October 22, 1969 [5] and three days after his wife's release from the hospital on October 24, 1969, Roberts, without having received any further orders or instructions from anyone, returned again to Fort Meade. This time, that is, on October 27, 1969, Roberts states that he was told that he would be placed in the stockade while the Army decided what to do with him. In any case, it is undisputed that Roberts was placed and detained in the stockade at Fort Meade from October 27, 1969 to December 1, 1969, on which latter date he was released from confinement but restricted within an area at Fort Meade until December 22, 1969. On that date, he was found not guilty of having been AWOL by a special Army court martial. Thereafter, an administrative determination under 10 U.S.C. § 972 was made at Fort Meade that "time lost" between February 26, 1969 and October 27, 1969 was to be made good, and Roberts' induction period accordingly was extended from and after March 11, 1970. On February 16, 1970, Roberts, through one of the civilian attorneys who has represented him in this Court, appealed that determination to higher Army authority under the applicable Army regulation.[6] In his forwarding letter, that attorney stated that Roberts would seek habeas corpus relief in this Court if the Army failed to discharge Roberts on March 11,

---

5. Roberts alleges in his petition herein that the premature birth was "partly due to the extreme aggravation and anxiety endured" by his wife and himself during the period since February, 1969 and "partly due to the financial pressure resulting from not having received any money from the Government since February, 1969." The Government has informed this Court that Roberts was paid $300.00, in advance of his regular pay day, on February 1, 1969; a second advance of $121.00 on that day on his February, 1969 pay, his January, 1969 pay having been fully covered by the aforesaid $300.00 payment; that Roberts' wife received an allotment of $130.00 per

month during the February, 1969–October, 1969 period plus $6.25 per month for savings bonds; and that the Army was, on May 6, 1970, then deducting from Roberts' pay certain of the money so loaned to Roberts in February, 1969, as well as the aforesaid payments to Mrs. Roberts during the February, 1969–October, 1969 period. Roberts also apparently received no pay during the period after October 27, 1969 in which he was confined in the stockade at Fort Meade. See discussion, *infra*, in the body of this opinion, concerning that confinement.

6. AR 635–200. *See* n. 10 *infra*.

1970. On March 12, 1970, Roberts instituted the within proceedings. At the request of government counsel, this Court withheld a ruling in this case pending final administrative action by the Army.[7] That action was taken on April 21, 1970 when the Adjutant General of the Army determined that—

> Specialist Roberts was in a leave status from 1 February 1969 until 26 February 1969. From 27 February 1969 through 26 March 1969, he was in a duty status, at home awaiting orders. From 8 October 1969 until 27 October 1969, he demonstrated his intent to effect his return to military control and this period should also be considered to be duty time.

Thus, the Army, in its final action on April 21, 1970, credited Roberts with time between February 27, 1969 and March 26, 1969, and time between October 8, 1969 and October 27, 1969. Both of those periods of time had been earlier included as "lost time" by administrative action taken under 10 U.S.C. § 972 at Fort Meade after the court martial proceedings. Thus, the Army's final determination is that the period of "lost time" commenced March 27, 1969 and ended October 7, 1969.

An internal Army memorandum, prepared by Lt. Col. Cook, Chief, Military Personnel Law Term, Military Affairs Division, and dated April 15, 1970, has been forwarded to this Court as a part of the Army's record in this case. That memorandum was prepared in support of a recommendation that the period from March 27, 1969 to and including October 7, 1969 be classified as "lost time"—that is, in support of the subsequently determined final position of the Army as stated by the Adjutant General on April 21, 1970. The memorandum concluded as follows, after, in substance, reciting the facts related hereinabove:

In evaluating the evidence contained in "home awaiting orders" cases to ascertain whether there was sufficient evidence to support an administrative determination of AWOL as opposed to "duty," particular attention has been given to circumstances indicating that the member could have believed that his absence was or was not authorized, based on his orders, written or oral, and the fact that an administrative determination of AWOL must be based upon substantial evidence. In previous cases, this office has expressed the view that where the member concerned was or may reasonably have been misled by his orders as to his status and made reasonable effort through military authorities to ascertain this status, he could properly be found to be in a duty status, notwithstanding that he was not in actual military control; however, when those circumstances are absent, a determination of AWOL is appropriate. Further, this office has recently taken the position that the member must demonstrate a good faith belief that he was authorized to remain at home for an extensive period (JAGA 1969/4890, 12 Jan 1970).

In all "home awaiting orders" cases, the member must not only act in good faith in remaining at home, he must also make reasonable efforts to ascertain his status when no orders are received within a fairly short period. If a member fails to make such reasonable efforts, this is taken as persuasive evidence that the member is no longer acting in good faith (JAGA 1969/4879, 7 Jan 1970).

Although, as indicated above, there is no direct evidence in the file that written orders were ever cut, it appears from the language in the appeal that such was the case. Par. 8 of the appeal states that " * * * [o]n 1 February 1969, subject enlisted man was ordered to report to Oakland Army Terminal on 26 Febru-

---

7. No contention has been made herein that any further review by the Army's Board of Correction and Review is necessary before this Court should rule on the issues herein presented. *See* United States ex rel. Brooks v. Clifford, 409 F.2d 700,

rehearing denied, 412 F.2d 1137 (4th Cir. 1969). *But see* Craycroft v. Ferrall, 408 F.2d 587 (9th Cir. 1969), vacated and remanded, 397 U.S. 335, 90 S.Ct. 1152, 25 L.Ed.2d 351 (1970). *See also* Beaty v. Kenan, *supra.*

ary 1969 for assignment to Viet Nam; and on 1 February 1969 he cleared post at Ft. Carson, Colorado, pursuant to said Orders. * * * "

Then, in par. 9, with reference to the fact that Roberts never received his personal effects from Ft. Carson, the following statement was made:

" * * * [h]owever, the personal effects (including the Orders assigning him to Oakland Army Terminal, and then to Vietnam) never arrived. * * * "

It appears then, that written orders certainly existed, were probably seen by Roberts before clearing Ft. Carson, but for some inexplicable reason, were not given to him before he left and were not sent to him at his leave address.

On the day his leave ended, Roberts apparently took certain steps to effectuate his return to duty. He made arrangements to fly to OAT but since he had no orders, he called OAT for instructions. These instructions were, as noted in par. 10 of the appeal, to, in effect, stay home and await further instructions. The record does not reveal the nature of the phone calls to Colorado Springs on the two previous days.

In cases where members are not in possession of orders and are told to remain home and await orders, this office has seen fit to allow such individuals a reasonable time in which to remain home pursuant to such instructions without taking further action to ascertain their status, assuming that the instructions given were credible, whether or not correct procedurally. Generally, a period of one month has been considered to be a reasonable time in which to await the promised orders without the requirement that further action be taken. After that period, however, continued inaction on the part of the member has been considered to be a breach of good faith on his part.

Certainly, Roberts showed good faith in arranging for a flight to OAT and in calling OAT to make sure he was doing the right thing. Furthermore, there is nothing on the record which would indicate that he was not justified in relying on the instructions allegedly given to him over the phone. For this reason, he should be allowed a reasonable time in which to have awaited further orders. After this time had passed, however, it was incumbent upon him to make reasonable efforts to again ascertain his status. Whether or not orders assigning him to OAT were actually cut before he left Ft. Carson, there is no doubt that he was aware of where and when to report, although written orders, if any, apparently never came into his possession. He therefore was at least on notice that his authorized leave ended on 26 Feb. 1969, despite the alleged telephonic instructions from OAT personnel. It should be obvious to the average soldier that telephone instructions to go home and await orders could or should be relied on only up to a certain point, beyond which one's reliance on them cannot be justified by any standards. It is for this reason that a one-month grace period has been arbitrarily selected—to give the AWOL individual every benefit of the doubt, in questionable cases, so as not to unjustly penalize him for relying on vague or erroneous instructions of Army personnel who act under color of authority.

With regard to possible excusal of the time Roberts spent "at home awaiting orders" after the month's grace period, he must affirmatively demonstrate for the record that he had cause to continue in the good faith belief that he was justified in remaining at home. In order to so demonstrate his good faith, he must show evidence of affirmative efforts, within reason of course, to ascertain his status and that he found just cause as a result of these efforts to continue to believe that he was authorized to remain at home, without fear of penalty.

The record in this case is devoid of any evidence whatsoever of attempts on the part of Roberts to ascertain his status during the period 26 Feb 1969–8 Oct 1969 (over seven months). It would

have been a simple matter for Roberts to have sought definitive information at HQ, DA, at any time had he so desired as he was within easy travel distance of the Pentagon during his entire absence. See JAGA 1970/3824, 10 Apr 1970.

There is no question that Roberts once again made efforts to ascertain his status from 8 Oct 1969 when he wrote DA requesting instructions as to what to do. He demonstrated his willingness to comply with any instructions which were forthcoming as a result of his inquiry to DA by the fact that he reported to Ft. Meade in accordance with the instructions he received. For this reason, the period during which he awaited a reply from DA should not be charged as time lost.

With due consideration for the domestic hardships suffered by him at one point, it appears that he demonstrated good faith in his efforts to ascertain his status from 8 Oct 1969 until he was incarcerated by the MPs on 27 Oct 1969. His "good faith" would be questionable here as well if the record indicated that he acted to return to military control solely on the advice of counsel. However, the record does not show that he acted in any other way than voluntarily and of his own accord.

It is recognized that Army officials occasionally mislead individuals into reliance on faulty advice to their detriment, and that individuals who do make efforts to ascertain their status are often rebuffed, confused, or even ignored by Army officials. Fault on the part of the Government does not, however, give an individual impunity to relax his efforts to return to military control. The fact that the Government can be and often is at fault is the basis for the "reasonable time" rules established by this office. These rules, however, do not excuse a continuing period of inactivity such as the one in this case. Roberts, therefore, should be required to make up the time period specified in the "streamliner."

The opinion in this case is bottomed entirely on the "facts" provided by the appellate brief of Roberts' counsel, and thus it can be assumed that the decision has been reached in light of the best case that can be made for appellant.

There is, as indicated above, a paucity of case law in connection with the issue presented herein. In Beaty v. Kenan, *supra*, the soldier therein involved, after enlisting for a two-year Army term on February 9, 1967 and while in Germany for training, volunteered for duty in Viet Nam. On November 9, 1967, he received orders granting him a sixty-day leave to visit his family in California, and instructing him to report at Fort Lewis, Washington, but not informing him of the specific time to report. Before the expiration of his sixty-day leave, Beaty attempted to ascertain when to report, first by a telephone call in December, 1967 to a recruiting sergeant at a California post, and also by a telephone call on January 15, 1968 by his parents to the Classification and Assignment Center in Washington, D. C. The latter call was placed because the recruiting sergeant had advised Beaty to stay at his home and await orders, or if he desired, to call the Classification and Assignment Center. The call to the latter by Beaty's parents elicited the instructions that their son should await further instructions.

On March 30, 1968, about two months after his sixty-day leave had expired, and after Beaty was involved in a California automobile accident, two telephone calls, made by Navy security personnel in California to Fort Lewis, elicited the information that Beaty was not AWOL and the instructions that he "was free to go home and await orders as before." Beaty v. Kenan, *supra* 420 F.2d at 57.

On March 17, 1969, five weeks after his original two-year enlistment term expired, Beaty appeared at a California Army post and requested his discharge. Thereafter, the Army determined that Beaty was required to make up time lost

after January 29, 1968.[7a] Beaty sought habeas corpus relief in federal court in the Northern District of California. In submitting the case in that court, government counsel conceded that Beaty "had been away from duty without proper authority only after April 15, 1968," i. e., from about two weeks after the Navy phone calls. Beaty v. Kenan, *supra* at 57 n. 1. After the District Court denied relief, Beaty successfully appealed to the Ninth Circuit, which granted the writ he sought, holding (at 59) that while Beaty had "a continuing duty of attempting in good faith to ascertain the extent of that duty," and not to sit "at home and [do] nothing to ascertain when the Army wanted him," there was

> no basis in fact for holding that two weeks later, on April 15, 1968, he was under a duty to seek further information. In conceding the reasonableness of appellant's action from January 29 to March 30, the Government vitiated any basis in fact for claiming that appellant was again under a duty to clarify his status a *mere two weeks* after LeMoore Naval Air Station directly contacted Fort Lewis and was told "[s]ubject was not AWOL and was free to go home and await orders as before." We think it important to note that the conceded reasonableness of appellant's action in February and March was based upon (1) the December contact with the recruiting sergeant in appellant's hometown (C.T. 22), and (2) his parents' call to Washington on January 15 (C.T. 28). If these actions justified the absence of appellant for the two month period conceded by the Government, we think that appellant was justified in relying for a further period of time on the information he received *directly* from

Fort Lewis while his status was being checked at LeMoore on March 30.

Sometime before February 9, 1969, when his enlistment ended, and before March 17, 1969, when he requested his discharge, the Army should have caught up with him. It did not do so, and in the unique posture of the facts of this case, we can find no basis in fact for holding appellant violated his "continuing duty" to use reasonable efforts to ascertain what his Army orders were. [at 59–60] [emphases in original].[8]

The Government urges that *Beaty* is distinguishable from the within case because Beaty did not know the exact date he was to report whereas Roberts did; that Roberts waited until the last two or three days of his leave before he made any effort to obtain instructions; and that an additional check in Beaty's case was made by the Navy Patrol. But in *Beaty*, the soldier had no contact with the Army for nearly one year (March 30, 1968 to March 17, 1969) as contrasted with almost eight months (February 26, 1969 to October 8, 1969) in the case of Roberts; and in this case, Roberts contacted the Army authorities, not as did Beaty for the purpose of seeking a discharge, but rather to obtain instructions at a time when he still had about six months of his service period ahead of him.

In McFarlane v. De Young, *supra*, petitioner, inducted into the Army for a two-year term on September 6, 1967, was ordered on February 27, 1968 to report to Fort Lewis on April 1, 1968 for assignment to Viet Nam. About March 1, 1968, he began a thirty-day leave. Approximately on March 24, 1968, while on leave, he was hospitalized for an

---

7a. Thereafter, the Government, at some stage of the proceedings, moved the January 29, 1968 date back to March 30, 1968; and during the court proceedings, changed the March 30, 1968 date to April 15, 1968.

8. This Court unfortunately is constrained to note that the word "unique" states

a "consummation devoutly to be wished." See also the statement in *Beaty* (at 59) that that case involved "the *highly infrequent* concurrent negligence of both the Government and a serviceman" (emphasis added). But see Patnode v. Alexander, *supra*; McFarlane v. De Young, *supra*, and the within case.

emergency appendectomy, contacted Fort Lewis and was instructed to remain at home pending further instructions. On March 28, 1968, McFarlane wrote to Fort Lewis. Thereafter, as late as May 18, 1968, certain military authorities in California were in touch with him. On June 19, 1969, he appeared before his local draft board in response to a letter from that board. McFarlane's next contact with the Army or any military authority was on September 4, 1969—two days before the termination date of his two-year induction term—when he appeared at the Presidio in San Francisco to inquire about a discharge. Thereafter, the Army determined under 10 U.S. C. § 972 that McFarlane had been absent without authority since June 1, 1968. Noting that McFarlane had no contact with the Army from April, 1968 to June 19, 1969, that he was gainfully employed (apparently during at least a part of that period) [9] and that he appeared at the Presidio—only two days before his term of service was to expire—for the purpose of requesting a discharge, the District Court denied him the habeas corpus relief he sought.

In Patnode v. Alexander, *supra*, Judge Harvey, in this Court, granted habeas corpus relief in a case in which the soldier-petitioner made numerous efforts to clarify his status and to obtain instructions. In that case, as in *Beaty*, *McFarlane* and herein, the Army lost track of the soldier and was unable to produce anything like complete documentation. While such occurrences can perhaps be expected in what is an enormous manpower operation, the Army's applicable regulations fail to specify the exact number of days, after a soldier has last had any contact with the Army, which may pass before that soldier has an affirmative duty again to get in touch with the Army.

The Army's applicable regulations do, however, provide, in implementing 10 U.S.C. § 972, that a soldier "who renders himself unable for more than one day to perform duty" because of his "absence without authority" [10] is liable for assessment of time lost to be made good. 10 U.S.C. § 972 itself refers to a person "absent from * * * duty for more than one day without proper authority." [11] Those last three words are to be compared and contrasted with the words "absent without leave" as the latter are used in a court martial sense. The Army's regulations dealing with personnel absences, namely, AR 630–10, provide in part: "The results of a court-martial or military justice determination are not conclusive," [12] insofar

---

9. In this case, government counsel appeared to suggest in oral argument that Roberts' lack of civil employment should be weighed against him. Seemingly, the absence or presence of employment can be argued either way. In *Patnode*, the Army conceded that the fact that Patnode engaged in civilian employment during the period of what was contended to be absence without authority was "inconsequential" (at 11). The same adjective would seem appropriate in this case in which there was a lack of such employment.

10. AR 635–200, Change 16, dated November 26, 1969, Section II, par. 2–3, provides, in relevant part, as follows:
2–3. *Time lost to be made good.* Every individual in active Federal service who renders himself unable for more than 1 day to perform duty will be liable, after a return to full duty status, to serve for such period as is necessary to complete his full term of service or obliga-

tion, exclusive of such time lost.
a. Lost time in the sense of this regulation refers to periods of more than 1 day during which an individual on active duty is unable to perform duty because of—
(1) Desertion.
(2) Absence without proper authority.
(3) Confinement under sentence.
(4) Confinement while awaiting trial or disposition of individual's case, if trial results in conviction.
(5) Intemperate use of drugs or alcoholic liquor.
(6) Disease or injury, the result of individual's own misconduct.

11. *See* n. 1 *supra*.

12. AR 630–10 (entitled Personnel Absences —Absence without Leave and Desertion), Change 6, dated May 24, 1966, provides, in pertinent part, as follows:
70. *Classifying absence.* a. Whenever a member is absent under circumstances which make it appear that he was ab-

as 10 U.S.C. § 972 determinations are concerned. The bent of AR 630–10 reveals that the Army interprets 10 U.S.C. § 972 as enabling the assessment of lost time thereunder against a soldier who is not court-martialed or who is not found guilty if court-martialed.[13]

The policy analysis set forth in Lt. Col. Cook's memorandum, quoted from extensively, *supra,* is consistent with the provisions of the Army's applicable regulations as set forth in AR 635–10 and 635–200. That analysis and those provisions, as does the Ninth Circuit's opinion in *Beaty,* subject the individual soldier to the extended service provided by 10 U.S.C. § 972 if an individual soldier, after he has been lost by the Army and himself asks the Army for orders, fails to try again to obtain orders after the passage of a period of time following his last such prior attempt and after a date has arrived at which he knew or should have known that he had a duty to contact the Army once again. The Army has apparently not provided any more definite standard for the guidance of its soldiers, its administrators, or reviewing federal courts.

In this case, the basic question is whether Roberts knew or should have known on March 27, 1969 that he should, on that day, have again contacted the Army and tried to secure his orders. In determining whether there is any basis in fact for the Army having answered that question in the affirmative, all of the developments between February 1, 1969, i.e., the date Roberts received orders to report to Oakland on February 26, 1969, and October 27, 1969, i.e., the date Roberts went to Fort Meade for the second time, are relevant. There would appear to be little question that, at some time prior to October 8, 1969, i. e., the date Roberts wrote to the Pentagon, those events provide a sufficient circumstantial basis in fact for a determination that Roberts knew or should have known that he should have contacted appropriate Army authorities in connection with his status. That conclusion, of course, does not in and of itself answer the more narrow question of whether those

---

sent without leave, his commanding officer will conduct an informal investigation into the facts of the case immediately upon the member's return. The purpose of such investigation is to determine, for administrative purposes, whether the absence was authorized. The results of this determination will be used primarily for the purpose of deciding whether the member should be charged with time lost under the provisions of paragraph 2–3, AR 635–200. The following are some factors to be considered in making this determination:

(1) The results of a court-martial or military justice determination are not conclusive.

(2) The orders and instructions, both written and oral, which the member received before and during his absence which related to his absence.

(3) The frequency and type of contact the member had with the military while he was absent.

(4) The age, grade, experience and intelligence of the member.

13. In *Patnode, supra,* Judge Harvey (at 14) wrote:

Although a different standard of proof, namely proof beyond a reasonable doubt, would be required in a court-martial proceeding, the failure of the Army to charge Petitioner under the Uniform Code of Military Justice is certainly pertinent to the inquiry here. In this case, a court martial took place. The resulting acquittal, while pertinent, is not, for the reasons discussed in the body of this opinion, controlling in connection with the 10 U.S.C. § 972 proceeding herein involved.

10 U.S.C. § 972 extends the period of time during which a soldier's right to return to civilian status is restricted. While that restriction may be bottomed on criminal conduct, it can also be bottomed on, as here, conduct of a soldier not amounting to a crime, but constituting such a failure to perform his duty during a part of his primary period of service so as to justify his not receiving credit for service during that part of such primary period. In this connection, it is noted that Roberts was not, in fact, on military service or under military control, during the period from March 27, 1969 to and including October 7, 1969, that is, the period the Army has classified as lost time, but was living at home with his wife.

events also provide sufficient circumstantial evidentiary basis in fact for determining that Roberts knew or should have known, on March 27, 1969, that he should, on or before that date, have so gotten in touch with some Army official. It is not up to this Court to select the earliest date which the Army could have chosen and could have supported, under the no-basis-in-fact court review test, as a date upon which Roberts knew or should have so known. What this Court is called upon to decide is whether there is any basis in fact for concluding that Roberts, under the facts as alleged and related by Roberts himself, knew or should have so known on March 27, 1969.

■ This Court reluctantly concludes that there is such a basis in fact. In reaching that determination, this Court would be far more comfortable if the Army had initially selected a date later than February 27, 1969; if the Army, after this case had been instituted, had chosen a date later than March 27, 1969;[14] if the Army had not held Roberts in the stockade for a period of more than one month; and if the Army had not so heavily financially penalized Roberts.[15] But this Court cannot reach the conclusion that there is no basis in fact for concluding that Roberts, on March 27, 1969, having been given a fifteen-day leave in early February, 1969, having sought his orders at the end of February, 1969, having, by March 27, 1969, not heard for more than four weeks after he last was in contact with anyone in or connected with the Army or the military establishment, knew, or should have known, that on that last mentioned date, namely, March 27, 1969, he had an affirmative obligation to try again on that date without permitting any further passage of time. While this Court recognizes that the standards set by the Army are far from precise, and that those standards could seemingly easily be made more precise and in that way the type of problem which has arisen herein could be avoided, this Court does not believe that those standards are unconstitutionally vague or violative of the statutory provisions of 10 U.S.C. § 972. Those standards do, after all, at least in the context of this case, establish only a common sense duty that, having not been in contact with and having not heard from the Army after February 26, 1969, Roberts should have tried again to obtain orders on or before March 27, 1969.

■ The Army seemingly does not challenge the jurisdiction of a federal court in a habeas corpus proceeding to review final Army administrative action under 10 U.S.C. § 972, and to apply the "no basis in fact" standard of review. That test was specifically applied in Beaty v. Kenan, *supra,* and in Patnode v. Alexander, *supra,* in both of which cases relief was granted; and seemingly also in McFarlane v. De Young, *supra,* in which relief was denied. In *Patnode,* petitioner therein contended, *inter alia,* that the no-basis-in-fact test was too restrictive to apply in a federal habeas corpus proceeding challenging an administrative determination under 10 U.S.C. § 972.[16] That contention has apparently been adopted by Roberts' counsel herein.[17] However, the no-basis-in-fact

14. In *Beaty,* the Ninth Circuit referred to the number of days conceded by the Government therein as a reasonable time as "a mere two weeks" (at 59). In this case, the thirty-day period is only slightly more generous, but would seem sufficient in the factual context of this case, including, *inter alia,* the fact that Roberts was initially given a fifteen-day leave in early February, 1969 and the thirty-day credit period resulted in that fifteen-day leave becoming approximately a forty-five-day "leave."

15. *See* n. 5 *supra.*

16. In *Patnode,* while the petitioner prevailed under the no-basis-in-fact test, the Court therein (at p. 9) specifically rejected petitioner's alternate argument that "some other test should be applied under the statute" (the statute being 10 U.S.C. § 972).

17. *See* the discussion in Note, "Developments in the Law—Federal Habeas Corpus," 83 Harv.L.Rev. 1038, 1249–52 (1970).

review standard has not only been applied in conscientious objection cases, *see* United States ex rel. Brooks v. Clifford, 409 F.2d 700, 705 (4th Cir. 1969), rehearing denied, 412 F.2d 1137 (4th Cir. 1969); Reitemeyer v. McCrea, 302 F.Supp. 1210, 1219 (D.Md.1969) affirmed Quaglia v. Boswell, 423 F.2d 1229 (4th Cir. 1970); Cooper v. Barker, 291 F. Supp. 952, 957 (D.Md.1968), but it was also seemingly applied in Jenkins v. Commandant, 303 F.Supp. 1150 (D.Mass. 1969). In that case, the Court granted habeas corpus relief to a Marine who was denied a hardship discharge—a denial which Judge Ford held (at 1153) "was not supported by substantial evidence and was without basis in fact."

10 U.S.C. § 972, and the Army's implementing regulations discussed *supra,* neither provide for, nor in any way indicate a contemplation of, court review. Nor do they contain any requirement of a hearing. In that connection, it is noted that in *Patnode,* petitioner also contended that the words "competent authority," [18] as used in 10 U.S.C. § 972, require a decision after a court martial proceeding, or at least an adversary type of hearing. That latter position, insofar as it reads those words to require a military criminal trial, has been rejected in United States ex rel. Gaston v. Cassidy, 296 F.Supp. 986, 990–991 (E.D.N.Y. 1969). *See also* United States ex rel. Parsley v. Moses, 138 F.Supp. 799, 803–804 (D.N.J.1956). This Court adopts the reasoning of the opinions in those cases, even though the argument that some type of hearing should be held before a soldier's term of service may be extended under 10 U.S.C. § 972 is not without appeal. However, that issue need not in any event be resolved in this case, because the Army—and this Court—have

adopted Roberts' allegations as the factual basis of decision. Thus, with one exception, none of the factual elements are in dispute. That one exception is an important one—i.e., what Roberts knew or should have known on March 27, 1969. In this case, the final Army administrative determination involving the resolution of that underlying factual issue was made after interviews with Roberts at Fort Meade and after his counsel had an opportunity to set forth fully all of the factual and legal positions contended for by Roberts, both with regard to his state of mind on or before March 27, 1969, and otherwise. The interview and review process is utilized by the Army in many contexts, including those dealing with requests for discharges in conscientious objector cases, *see,* for example, United States ex rel. Brooks v. Clifford, *supra*; and Reitemeyer v. McCrea, *supra,* involving delicate and important basic rights. To date, the courts have not required the military to hold judicial or semi-judicial types of hearings in conscientious objector cases and have usually confined court review of administrative rulings dealing with those questions to the no-basis-in-fact test. This Court, in this case, declines to impose any additional requirement upon the Army in connection with the 10 U. S.C. § 972 issue herein involved, or to utilize any less restrictive review test than the no-basis-in-fact standard.[19]

There remains the contention that the Army violated its own regulations by failing to mail the ten-day next-of-kin letter referred to in AR 630–10, par. 5, which provides that when a soldier is absent for ten consecutive days, his unit commander is to mail a letter to the absentee's nearest relative advising the latter that the soldier is ab-

---

18. *See* n. 1 *supra.*

19. Even if the Army's determination herein under review should be subjected in this federal habeas corpus proceeding to the substantial evidence test, or to the test of whether the facts found by the Army are "supported by reasonable, substantial and probative evidence on the record as a whole" (*see* the Immigration and Nat-

uralization Act, 8 U.S.C. § 1105a(a) (4) (1964); *see also* Townsend v. Sain, 372 U.S. 293, 313, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), and the discussion, generally, in Note "Developments in the Law— Federal Habeas Corpus," *supra* at n. 17), that determination would still pass muster under either such review test and require denial of relief herein.

sent without leave, may face a court martial proceeding and discontinuance of allotments, and should return to military control. In United States ex rel. Gaston v. Cassidy, *supra*, 296 F.Supp. at 992, Chief Judge Zavatt held that "[a]bsent a showing of prejudice to petitioner," the Army's failure to follow that regulation did not entitle a soldier, in a federal habeas corpus proceeding, successfully to challenge a 10 U.S.C. § 972 Army determination. While regulations once promulgated must be "followed scrupulously," United States ex rel. Brooks v. Clifford, 409 F.2d *supra* at 706, the ten-day letter provision of AR 630–10, par. 5, is obviously not applicable in a situation in which the Army has lost a soldier and in which the Army itself rediscovers the soldier only when the soldier himself reestablishes contact with the Army by his own efforts.

For the reasons stated in this opinion, Roberts' petition for federal habeas corpus relief is hereby denied.