**Application of Andrew F. KEIL**

v.

**Lt. General Johnathan O. SEAMAN, Commanding General of the First Army of the United States,**

and

**Stanley Resor, Secretary of the Army,**

and

**Melvin Laird, Secretary of Defense.**

**Civ. No. 70-25.**

United States District Court,
D. Maryland.

June 11, 1970.

William H. Zinman, Baltimore, Md., for plaintiff.

Stephen H. Sachs, U. S. Atty., and Clarence E. Goetz, Asst. U. S. Atty., District of Maryland, for defendants.

FRANK A. KAUFMAN, District Judge.

Andrew F. Keil, a private in the United States Army, seeks to be discharged from the Army as a conscientious objector pursuant to Department of Defense Directive No. 1300.6 and Army Regulation 635-20. On September 17, 1969, Keil filed his application for a 1-O classification as a conscientious objector. That application was disapproved on November 8, 1969.

Keil was born and raised as a Roman Catholic, the faith of his mother. He was educated in Catholic schools on the elementary, secondary and college levels, graduating from Fordham University in June, 1968. While at Fordham, he applied for Marine Corps O.C.S. and was commissioned as a Second Lieutenant in the Platoon Leaders Corps Program. Later, he resigned his commission and was issued a general discharge from the Marine Corps under honorable conditions in October, 1968. In connection therewith, the Commandant of the Marine Corps noted that Keil had "failed to attain the accepted standards required successfully to complete Basic School." Keil's "failure was due, at least in part, to a lack of effort on his part" (September 13, 1968 communication from Commandant of the Marine Corps to Secretary of the Navy). Keil, himself, admitted that he lacked the "necessary drive or motivation to complete the course."

In March, 1968, Keil was inducted into the Army. In his September, 1969 application, Keil stated that he did not apply for a conscientious objection classification by Selective Service and wrote:[1]

3.k. 1. Although I had resigned my commission as a second lieutenant in the Marine Corps Reserve only five months previous to induction, my beliefs concerning

1. See reference in quote, *infra*, p. 818; see also n. 2 *infra*.

the individual act of taking another's life had not crystallized until after entry into the Army. While in the Marine Corps I was concerned with the responsibility of leading others into a situation where they would be required to kill, a situation I myself had not satisfactorily settled on a moral basis, nor one which I could advocate as being justifiable. I had not considered the moral implications on a personal level. I realized I could not accept the status of a combat leader with the hesitation I possessed. But at this time I did not face the problem of whether I myself would kill. I did not do so 'til after I was inducted.

2. Prior to induction I had no objection to serving in the army provided I did not have to bear arms. I had hoped I would be fortunate enough not to draw Infantry MOS and serve my two years in another task. I thought my education and past experience in the military as a second lieutenant who had resigned a commission in the Marine Corps would be considerations to prompt such a decision. My two prior applications were for a change of MOS, preferably medic, and though refused, indicated my desire. Since then, however my views have deepened and I find I must request separation from the Army.

3. I was not fully aware of what was necessary to qualify for this status, or if indeed I qualified at all as a Roman Catholic.

4. I knew my father, as a military man who retired from the Air Force as a LTC, would be affected by such an action in an unfavorable way. In like manner I was aware of the regard in which a conscientious objector is often viewed by civilians as well as the Armed Forces, and this contributed to my hesitancy in applying for conscientious objector status.

After Keil was inducted into the Army and while he was in basic training, he filed two (2) successive unsuccessful applications for 1–A–O conscientious objector status. After rejection of his said applications, he refused an order to take part in advanced infantry training, allegedly because of his beliefs; was prosecuted, convicted, and sentenced to serve two months in the stockade at Fort Jackson, South Carolina; served all but ten days of that sentence; and, while in the stockade, filed on September 17, 1969, a 1–O application for discharge as a conscientious objector. In connection therewith, Keil, in his supporting statement, stated, in part:

I resigned my commission as a Second Lieutenant in the USMCR for reasons which closely approximate the reasons for which I am now asking CONOBJ status. I stated, and it is on record, that I believed I could not fulfill the requirements of a combat leader, that I no longer considered myself qualified to be a Second Lieutenant and that I no longer had the desire to fulfill the mission for which I was being trained. Under these self-accusations and because my academic record was below average, I was relieved of my commission after stating my desire to resign and given a general discharge under honorable conditions.

But the record only reveals half of the story. The reason I could not qualify as combat leader or as second lieutenant, why I lacked the desire to be a leader and why I was academically deficient lies in my personal reaction to war. This personal reaction took a long time to formulate and be realized by myself and it is because of this that I find myself in my present difficulty. Why it was so long in coming lies in the training I had.

When I first signed up in the Platoon Leaders Corps Program it was for all the wrong reasons. The prestige of the position, the glamor of the uniform, the privilege of rank, and the misinter-

preted glory of combat were the considerations that prompted me to enlist. I do not think it unusual that I was att- [sic] to the program for these reasons because it is more often than not these same appeals the recruiter purposely displays to induce and enhance potential applicants. These attractions gave me the impetus to sweat through the summer training sessions between semesters in college which I was subject to. In these sessions more was required in the line of physical effort than deliberate thought concerning what I was training for. I was urged not to think but to react and I soon realized it was indeed easier not to question but to obey.

It was in my senior year of college when I first began to doubt my position. The war in Viet Nam was being questioned ethically, politically, morally, and militarily and because I was known on campus to be involved in the PLC program and due to receive my commission upon graduation, I was often questioned regarding my position and required to defend my actions. All this happened in the typical campus atmosphere of challenge and debate and I was anxious to defend myself. But questions were being asked that I couldn't answer with the military line I had absorped, questions that required a great deal of thought and analization and which is shadowed the black and white perspective into which my previous view of the war issue had fallen. The one universal virtue of a campus community, that of keeping an open mind, I had violated by being content to listen only to the accepted military standpoint. When I was questioned on social, ethical, and humanitarian standards I could not honestly defend the consequences of the actions which my position as a combat leader would require me to do.

I decided to go ahead and accept my commission, again, for the wrong reasons. I was already heavily committed to the program (though I could still have refused commissioning), my parents and friends were anxious for the event and other friends, who were in the program with me and whom I had encouraged to sign up, had persuaded me to stay. The doubts I still had, more pronounced than ever. It woud have been a very difficult thing to refuse the commission so I decided to take the easy way out and say nothing.

Six days after graduation the twenty week post commissioning training began. By the eight week I requested permission to resign my commission. I could no longer carry the pretense that I believed in what I was doing. My academic record was an indication of the resistance that had been building inside me. As a college graduate I had no excuse for failing the tests I was given. They were of no outstanding difficulty and did not require an extraordinary amount of intelligence to pass. Yet I was failing them and after putting in far more study time than was necessary. I began to realize that though the effort was there, the desire and motivation and conviction was missing. When evidence of my changing attitude began to appear in other than academic areas, I realized there was no longer any use or any good to pretend sincerity. The effects of not speaking up could have profound reprecussions at a later date when I might involve the lives of others as well as my own. If, by some means, I was able to successfully complete the training course, I realized I could never order others to risk their lives over something I myself could not believe in. Every man who did die obeying an order I issued would be a face I could never forget because I was feigning a cause others were dying for.

I was discharged in October and by March I was drafted. I did not attempt to dodge the draft because I still believed I should fulfill my two year obligation. Though I couldn't accept the war because of the killing involved I believed I could satisfactorily fulfill my obligation in other than combat status. For this reason and to indicate my desire to serve to the Army as well as for the reasons explain-

ed in part 3k[2] of this application. I allowed myself to be drafted without registering my feelings and completed basic training without making application for conscientious objection. I believed I served well and evidence of this fact can be seen by my being chosen outstanding trainee of my company upon graduation from basic.

I was assigned to Infantry AIT and with this assignment came the crisis I had hoped to avoid. I now knew I would be required to use the training I had been given no longer on paper targets but on human beings. By this time, as a result of basic training which caused me to change the nature of my convictions as a non-participant in a leadership capacity to a non-participant in any capacity involving the use of weapons for killing. I had reached the decision I had been postponing. I requested permission to submit for conscientious objector under the grounds of 1–A–O. Since then this application has been twice denied. Because I am sincere in my belief I refused an order to train after my application was denied and am now serving time in the stockade. When I finish I fully expect to be placed in the same situation, being once again ordered to train. I must still refuse and continue to refuse regardless of the consequences until I am allowed to carry out my convictions which result from my moral standings. It is regrettable that the Army chooses to deal with me this way.

Since my transferral to Infantry AIT, 3d Bde, and since my experiences with my commanding officers and the advice they have given me (including the written response by Chaplain Lawrence T. David, 3d Brigade Chaplain to the interview requested by him with me and which is filed with my first application for conscientious objector in which he states "No matter what a man's MOS is he may be faced with the possibility of killing, especially in combat), as well as in accordance with my deepening views regarding the war and all wars in gener-

al, I find I can no longer follow my moral and religious convictions and still serve in the U.S. Army. At one time, assignment to the medical corps was acceptable and pleaded for. No longer. As the Army Field Manuel states: "The primary duty of medical troops as of all other troops is to contribute their utmost to the success of the command of which they are a part." (FM 8–10, P. 195). I have no doubt but that in line with this policy, sometime during the two years I am required to serve I shall be placed in a situation where I shall be forced to compromise the principles on which I now stand. That I am now serving time in the stockade is an indication of the resistance I shall inevitably encounter while trying to live my life in accordance with my belief. This leaves me no choice but to request discharge.

I believe it is now clear that I can not any longer accept as God's will what congressmen, generals, and draft officials might wish of me. Unthinking obedience has at least been made to stand without a virtuous or even patriotic facade; our concepts, both regarding love of man and love of native land, have been considerably enriched and expanded. In the words of the Fathers of the Second Vatican Council, I have learned that "Man's dignity demands that he act according to a free choice that is personally motivated and prompted from within, not under blind internal impulse nor by mere external pressures." (Constitution on the Church in the Modern World, Section 17). I have come to realize, though sometimes at great cost in suffering, that freedom and happiness ultimately spring from the individual's willingness to take responsibility for the use of his life.

On October 7, 1969, after an interview, Captain Colvin recommended Keil's application be approved, stating, in part:

Private Andrew Keil served as an officer with the Marines until he was discharged because of his beliefs to bear arms as a Conscientious Object-

2. See quotation, *supra*, pp. 816–817, and also n. 1, *supra*.

or. He has submitted twice before for reclassification to another MOS but were subsequently disapproved. For this reason and from my conversation with him I feel that Private Keil has based his application solely on religious convictions and is in keeping with the criteria outlined in AR 635–20.

On October 10, 1969, Lieutenant Colonel Hastings recommended disapproval of Keil's request, writing, in part:

Private Keil has been personally interviewed by the undersigned. It is felt that there are inconsistencies in his philosophy as well as his rationale for reaching his current beliefs.

On October 17, 1969, Captain Jones, a chaplain, after interviewing Keil, filed the following statement:

PVT Keil has many character statements included with his application to support his personal integrity and sincerity of belief. I personally cannot question his sincerity in voicing opposition to war or refusing to participate in it. He impresses me as a man of strong moral courage.

If PVT Keil is basing his application on religious grounds, perhaps his theology can be questioned. Religious scholars differ considerly concerning the teachings of Christ on war. There is also a vast difference of opinion among Catholic scholars concerning Christ's views on war.

PVT Keil is a devout Roman Catholic and bases much of his thoughts on various articles and documents written by Catholic scholars. Other Catholic scholars may have opposite views on the subject of war. PVT Keil, however, is true to his religious convictions even though these convictions may be founded upon mere opinion.

On October 18, 1969, Lieutenant Colonel Parsons, who did not interview Keil, recommended disapproval, writing in part:

This EM was not discharged from the Marine Corps because of his beliefs but was discharged because of his failure to maintain satisfactory performance. Attached to this application is a copy of a statement in EM's handwriting made at the time he was discharged from the Marine Corps and if he had these alleged beliefs he failed to indicate this fact in his statement.

There are two statements contained in this application written by persons who state that they are English Instructors at the university level. It might be well to check these statements out to determine if they were in fact written by these persons.

On October 20, 1969, Captain McIntyre wrote, in part:

This is the second time I have interviewed PVT Keil, the first time was for conscientious objector status. This request for discharge has no significant changes. PVT Keil has convinced me that he will not serve in the US Army in any capacity and will return to the stockade rather than train. However, it is my belief that PVT Keil is basing his application on personal beliefs and not religious beliefs and training. Recommend disapproval.

On October 22, 1969, Lieutenant Colonel George, after reviewing the application, but not having interviewed Keil, recommended disapproval, stating:

Evidence submitted is insufficient to warrant the discharge of enlisted man as a conscientious objector.

Private Keil submitted an application for classification as a conscientious objector on 2 June 1969. The application was disapproved by Headquarters, Department of the Army on 14 July 1969. EM resubmitted for classification as a conscientious objector on 30 July 1969. The application was returned without action by this headquarters on 2 September 1969.

On November 5, 1969, the Army Conscientious Objector Review Board concluded:

1. The Board finds that Keil does not truly hold views against participation in war in any form which are derived from religious training and belief. Sincerity is a threshold determination in each conscientious objector case, and as the Board determines this issue against Keil, his request for discharge under AR 635-20, 22 January 1969, may now [sic] be favorably considered. This finding is based on the following facts in the record:

a. Keil states in his application that he resigned Marine OCS because of his conscientious objection to participation in wa[r and] in his doubts as to his capacity to lead others in combat. This statement is not entirely correct, in information provided by his commanders indicate that Keil was actually eliminated from the Marine OCS program primarily because his unsatisfactory performance. The fact that Keil has made this misrepresentation casts doubts on the credibility of his entire application.

b. All of Keil's commanders recommended that his application be disapproved, with the exception of Captain Colvin. It appears, however, that Captain Colvin was not aware of the misleading nature of Keil's claim that he resigned from Marine OCS because of his scrupples against participation in war, since Colvin cites this factor as one reason for his recommendation of approval.

c. The Board does not lightly dismiss the statement by Chaplin Jones that Keil is sincere and that his views have a religious bases. It should be noted however, though that Chaplin Jones does state in his report that Keil's religious convictions are founded "upon mere opinion." This is an indication to the Board that Chaplin Jones is not entirely convinced that Keil has a sound religious bases for his conscientious objection. Because of the fact that all commanders, with the exception of Captain Colvin, have recommended disapproval of this application, the Board concludes that Keil lacks the depth of sincerity that one should expect from a genuine conscientious objector.

2. *Action of the Board.*

Disapproval

On November 8, 1970, Keil's application was disapproved by the Adjutant General of the Army who commented:

Applicant does not truly hold views against participation in war in any form which are derived from religious training and belief.

Keil's September 17, 1969 application contains many references to and analyses of his own religious views and tenets against war and participation therein. In addition, he attached to that application letters from his pastor and from three members of the Fordham faculty. His pastor, in a letter dated July 30, 1969, wrote:

I do not in any way consider him to be a faker, one trying to duped the Army, or in any other way one saving face from military service in the armed forces of our country. I sincerely believe him to be a young man whose character and reputation are above reproach. He has exhibited to me on many occasions his determination to follow out his ideals and I could not in any way see or say that he is only telling the truth, and nothing but the truth, in his statements to be a conscientious objective in the present crisis in Vietnam. I would not be so vehement in my letter to the Judge Advocant of the U.S. Army, if I myself didn't personally believe in Andrew Keil as a young man, whom I believe to be telling the truth to his superiors. I strongly urge you to give his case

every consideration, and I urge you to consider the merits of this young man whom I have personally known, and whom I consider deserves every consideration in defense of his case. I would hopefully feel that his present status could be changed and that I, as a friend and priest-counselor for Andrew Keil during his youthful years support his defense.

One of the faculty members stated in his letter:

Andrew F. Keil was a student in five courses taught be me at Fordham University, where he did his undergraduate work. Four of these courses were in Creative Writing. I came to know him very well.

Throughout his work ran a strong vein of idealism and self-searching. I recall distinctly that one of his plays and two of his short stories betrayed pacificist leanings—and not on a shallow level, because he seemed deeply troubled. We discussed his feelings on this subject.

He impressed me always—and very favorably—as a person of honest intellectual and emotional convictions. Though I am myself an army veteran and not a pacificist—very much to the contrary—I would believe without hesitation in the absolute sincerity of Keil's claim to being a conscientious objector.

Another faculty member expressed himself as follows in his letter:

Mr. Andrew Keil was a member of four of my courses at Fordham College. During that period and after, that is for four years, I became quite closely acquainted with Keil both academically and personally.

I read Mr. Keil's writings and talked to him at length and often. He was a guest in my home. One of the qualities that Andy always evidenced was a strong masculine frankness, a straightforwardness that forced his views to be stated honestly. I have never known Andy to be dishonest to me, even when I knew other students were misleading or deceiving.

I can not more strongly emphasize that Andy Keil's expressed convictions have always been, and I am sure remain, sincere.

It may be of interest that in long years of teaching I have never written this kind of letter before for any other student. Keil is a special case about whom I have no doubt; I believe his character is beyond question.

No one who personally interviewed Keil questioned his sincerity. Indeed, Captain Jones, the Army Chaplain, recorded a strong impression of Keil's integrity and sincerity. One interviewer, Colonel Hastings questioned Keil's rationale in reaching his beliefs and noted inconsistencies in the latter's philosophy. Still another interviewer, Captain McIntyre, stated in conclusory language that Keil's application was based "on personal beliefs and not religious beliefs and training."

This Court finds no basis in fact for concluding that Keil's views are not derived from religious training and belief. The standards of United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); United States v. Broyles, 423 F.2d 1299 (4th Cir. 1970); United States ex rel. Brooks v. Clifford, et al., 409 F.2d 700 (4th Cir.), rehearing den., 412 F.2d 1137 (4th Cir. 1969); and Fleming v. United States, 344 F.2d 912, 916 (10th Cir. 1965), teach that views such as those held by Keil are religious in nature, if sincerely held. Nor does this Court find any basis in fact for concluding that Keil's beliefs were not sincerely reached and held, or that they did not become crystallized and fixed until after his induction into the Army. After reading the entire file, this Court is unable to accept the characterization by the Army's Conscientious Objector Review Board that Keil, in his applica-

tion of September 17, 1969, attempted to mislead the Army or to be less than frank in connection with his recital of the events leading up to and surrounding his resignation and discharge from the Marine Corps. To the contrary, Keil's explanation of the development of his views and his difficulties in the Marine Corps and the Army are most convincing to this Court. This Court, therefore, holds that Keil's application for 1–O status and for discharge from the Army should have been granted by the Army under its own regulations and that Keil is entitled to have issue the writ of habeas corpus he seeks, requiring the Army to discharge him as a conscientious objector.[3] United States ex rel. Brooks v. Clifford et al., *supra;* Reitemeyer v. McCrea et al., 302 F.Supp. 1210 (D.Md.1969).

After Keil was discharged from the Fort Jackson stockade in September, 1969, he alleges that he "was assigned to a clerical position which minimally conflicted with his asserted beliefs" (Complaint, par. VI), but that after he received notice in the first part of November, 1969 of the denial of his application for 1–O discharge, he believed he would be again required to participate in weapons or infantry training, and went "AWOL." Thereafter, he surrendered himself to the Army authorities at Fort Meade, Maryland. Counsel for respondents has informed this Court that petitioner is currently assigned to clerical duties at Fort Meade, and that the Army contemplates no further disciplinary proceedings against him for going "AWOL," or for any other reason.

Keil's petition is hereby granted. If the Army does not (a) file an appeal from this Court's holding herein to the Fourth Circuit within the time provided for such appeal, and (b) thereafter diligently prosecute that appeal, the Army should grant the appropriate discharge; otherwise, this Court will issue a writ of habeas corpus requiring Keil's discharge.

---

3. Respondents have sought summary judgment herein. Respondents' motion in that connection is hereby denied.